## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLIAM NEGRON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. |
| CHICAGO POLICE OFFICERS REYNALDO | ) |
| GUEVARA, ERNEST HALVORSEN, | ) |
| EDWARD MINGEY, MARK OLSZEWSKI | ) |
| and the CITY OF CHICAGO, | ) |
| | ) |
| Defendants. | ) JURY TRIAL DEMANDED |
| | ) |
| | ) |

## <u>COMPLAINT</u>

Plaintiff, WILLIAM NEGRON, by his attorneys, Loevy & Loevy, for his complaint

against former Police Detectives, REYNALDO GUEVARA, ERNEST HALVORSEN,

MARK OLSZEWSKI, EDWARD MINGEY, and the CITY OF CHICAGO.

### INTRODUCTION

1.      Plaintiff, William Negron, spent 23 years wrongfully incarcerated for two

murders he did not commit.

2.      Mr. Negron was wrongfully convicted because Defendants Guevara,

Halvorsen, Mingey, and Olszewski conspired to frame him for the murders. These former

Chicago police officer defendants fabricated the only evidence used to convict him – two

false identifications.

3.      These same Defendants then lied in reports and at Mr. Negron's trial to cover

up their misconduct, leaving Mr. Negron to suffer the effects of being wrongfully convicted

of two murders he did not commit.

4.      It took over two decades for the conspiracy to unravel. After Defendants'

misconduct in this case and dozens of others came to light, the Cook County State's

Attorneys' Office dismissed all charges against Mr. Negron. He then received a certificate of

innocence.

5.      Plaintiff now brings this action to obtain justice and redress the

devastating injuries that Defendants have caused him.

## JURISDICTION AND VENUE

6.      T This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants'

deprivation of Plaintiff's rights secured by the U.S. Constitution.

7.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C.

§ 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial

district, the majority of the Defendants reside in this judicial district, and the events and

omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

9.      Plaintiff William Negron, a 42-year-old Latino man, born and raised in

Chicago.

10.      Defendant City of Chicago is an Illinois municipal corporation and is and/or

was the employer of each of the Defendant Officers.  The City of Chicago is liable for the

acts of the Defendant Officers while acting within the scope of their employment for the

City.

11.      At all times relevant hereto, Defendants Reynaldo Guevara, Ernest Halvorsen,

Edward Mingey, Mark Olszewski, and other unknown law enforcement officers

2

(collectively, the "Defendant Officers") were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.

12. Defendant Edward Mingey, at all relevant times, supervised the Police Officer Defendants. He facilitated, condoned and approved the constitutional violations committed by the Police Officer Defendants.

## FACTS

13. In 1994, Plaintiff lived with his mother in the predominantly Hispanic neighborhood known as Humboldt Park.

14. Unbeknownst to Plaintiff at the time, the Defendants were conspiring to frame him for a double murder.

15. The conspiracy began with Defendant Olszewski developed an animus toward Roberto Almodovar and his family. Mr. Almodovar was a friend of Plaintiff's.

16. Defendant Olszewski's disdain for Mr. Almodovar was palpable. At one point, while driving in a marked Chicago police squad car, Olszewski pulled up next to Mr. Almodovar and stated, "[t]ake your spic-ass back to Humboldt Park, you don't belong over here. You aren't fucking up my neighborhood," or words to that effect.

17. On several occasions in 1993 and 1994, Defendant Olszewski harassed Mr. Almodovar by arresting him for crimes he did not commit and threatening to pin additional false charges on him.

### The Murders

18. The night of August 31 into the early morning hours of September 1, 1994, two friends, Kennelly Saez and Jorge Rodriguez, were in front of 3920 W. Cortland, in Chicago.

3

19.     Saez and Rodriguez were smoking marijuana together. At some point, they were joined by Saez's girlfriend, Amy Merkes, and her friend, Jacqueline Grande.

20.     Saez's building bordered the sidewalk for nearly a half-block, and a single lightbulb over the door illuminated the area. The nearest streetlight was a quarter block away on the opposite side of the tree-lined street.

21.     At approximately 12:45 a.m., Saez was standing and speaking to his friends who remained sitting on a step adjacent to the sidewalk. A parkway separated the sidewalk from the street where cars were parked. A blue Oldsmobile drove down the street.

22.     The blue Oldsmobile containing three individuals passed them again, but this time it pulled into the alley that abutted the building. The car drove in reverse out of the alley, on to the street, and stopped in a space between two cars parked in front of the group. Saez approached the car and got as far as the sidewalk when the rear passenger said, "What's up, folks?" Saez replied, "who's that," and the rear passenger drew a handgun and began firing.

23.     When the firing began, Saez dove behind a parked car, and Grande, Merkes, and Rodriguez fled into the building's foyer, through an interior door and up a staircase. Grande, Merkes, and Rodriguez were shot as they ascended the staircase. Grande was shot in the back but kept fleeing up the stairs. Merkes collapsed and died in the stairwell. Rodriguez ran to Saez's third floor apartment and collapsed there. Grande took refuge in another third-floor apartment.

24.     The blue car sped away, and Saez ran to his apartment and called 911. Rodriguez was transported to a hospital and died soon thereafter. Grande was hospitalized for a gunshot wound to her back and shoulder.

4

25.     Chicago police officer Robert Lohman was on routine patrol when an off-duty deputy sheriff who lived in the area informed him that a drive-by shooting had occurred at the intersection of Cortland street and Harding avenue. Officer Lohman spoke to an injured Grande on-scene, who described the perpetrators as three Hispanics, sixteen to twenty years old, wearing Starter jackets. She was unable to describe the offenders' weights, heights, or hair styles.

26.     Later in the day on September 1, 1994, detective Dembowksi interviewed Grande at the hospital who memorialized her statements in a police report. Grande reported that the assailants were "three male Hispanics; the driver was tall and thin, dark hair, light complexion. The front passenger had a thin long face with a light complexion, black jacket, red hat. The back- seat passenger was skinny, dark hair, medium complexion, clean looking, all teens and early twenties."

27.     Saez was interviewed at the police station after the shooting and could only describe the offenders as three male Latinos in a blue car. Saez told the police he dove behind a car when the shooting started and did not see the offenders.

28.     The night of the murder, defendants Guevara and Halvorsen were assigned to the case. Sergeant Mingey routinely assigned Guevara and Halveorsen to murder cases that he wanted closed quickly.

### The Frame-Up

29.     As they had done numerous times in the past, defendants Guevara, Halvorsen, and Mingey began strategizing about whom they wanted to frame for the murders of Merkes and Rodriguez. Consistent with their custom, these Defendants saw no reason to waste time legitimately investigating the case to identify the true offenders.

30.     Guevara, Halvorsen, and Mingey turned to their colleague defendant Olszewski for input on who to "hook up" with this case. Defendant OLSZEWSKI suggested the perfect candidate – Mr. Almodovar.

31.     On September 4, 1994, Olszewski then falsely arrested Mr. Almodovar for the purpose of taking a Polaroid photograph of him that Defendants Guevara and Halvorsen could use to frame him.

32.     Defendant Olszewski suggested that the Defendants also target Plaintiff, because Plaintiff was friends with Mr. Almodovar and they used to hang out together. Defendants Guevara, Halvorsen, Mingey, and Olszewski all agreed to frame both Plaintiff and Mr. Almodovar for the Merkes and Rodriguez murders.

33.     Defendants Guevara and Halvorsen brought two photographs, depicting Plaintiff and Mr. Almodovar, to Grande while she was still at the hospital convalescing and falsely told her that Plaintiff and Mr. Almodovar were the offenders who shot her and murdered her friends. Guevara and Halvorsen told Grande that when she was released from the hospital she would have to identify them in a live line-up.

34.     On September 11, 1994, Defendants Guevara and Halvorsen with the approval of their sergeant, Defendant Mingey, arranged to arrest both Plaintiff and Mr. Almodovar. First, Defendants arrested Mr. Almodovar and brought him to Area Five detective headquarters. Later that same night, Defendants also arrested Plaintiff and also transported him to Area Five.

35.     On September 12, 1994, Defendant Guevara went to Grande's house to pick her up to view a live line-up. With the knowledge and approval of Defendants Halvorsen and Mingey, Guevara again showed Grande the same photos of Plaintiff and Mr. Almodovar he

and Halvorsen had previously showed her at the hospital. Guevara falsely told Grande that Mr. Almodovar fired a gun from the rear seat of the car and that Plaintiff drove the car and was also a shooter.

36.     Guevara and Grande drove to Saez's house. Guevara showed Saez the photos of Plaintiff and Mr. Almodovar and falsely told him that they were the offenders. Saez was reluctant to agree because he had not actually seen the shooters, but Grande assured him that Guevara was positive that they were the offenders. Saez, believing that he was the intended target of the shooting, and thus felt responsible for the deaths of his girlfriend and friend, felt enormous pressure to help prosecute the police-identified offenders.

37.     Guevara reassured him that Plaintiff and Mr. Almodovar were the offenders and that he should identify them. Saez knew that he possessed no independent knowledge that Plaintiff and Mr. Almodovar were the offenders, but ultimately did what Guevara told him to do.

38.     Guevara took Saez and Grande to Area Five to view a line-up. On the way, Guevara told Saez and Grande not to mention that he had shown them photographs of Plaintiff and Mr. Almodovar prior to viewing the line-up.

39.     Defendants Guevara, Halvorsen, and Mingey conducted a live line-up at roughly 6:00 p.m. on September 12, 1994. The Defendant Officers knew that no probable cause existed to justify the arrests of Plaintiff and Mr. Almodovar, but nonetheless had Grande and Saez pick them out of the line-up in order to fabricate false identifications of both of them. Unsurprisingly, Grande and Saez identified Plaintiff and Mr. Almodovar as the offenders based on the false statements of Guevara and Halvorsen and the photos of Plaintiff and Mr. Almodovar previously shown to them.

40.     After being falsely identified and then confined to a holding cell, Defendant Olszewski popped his head in, looked directly at Mr. Almodovar in the eyes, and said, "Gotcha!" before walking away laughing.

41.     Plaintiff was wholly innocent of the crime, and there never was any reason to suspect him in the murder.

42.     What is more, Mr. Almodovar, falsely identified by both Saez and Grande, had an alibi for the night of the murder – witnessed by numerous family members arguing with his girlfriend.

**Plaintiff's Wrongful Conviction**

43.     At Plaintiff's trial, Guevara falsely testified that after the shooting, Saez told him that the rear passenger-seat occupant of the car [the shooter] had a rectangular head and long hair. Guevara falsely testified that based on Saez's description, Guevara obtained a photograph of Mr. Almodovar and his "associate," Mr. Negron.

44.     Guevara also falsely testified that during a telephone interview with Grande on September 5, 1994, Grande supposedly described the car's rear passenger exactly as Saez had a few days earlier, that is, he had a rectangular head and long hair. Guevara's testimony concerning prior descriptions of the offenders by Grande and Saez were entirely fabricated.

45.     Guevara further falsely testified that he showed Grande two different photo arrays, one depicting individuals with long hair like Mr. Almodovar and another depicting individuals with short hair like Plaintiff and that she identified Mr. Almodovar and Plaintiff respectively from the two photo arrays. This testimony was wholly fabricated. Guevara *never* showed Grande photo arrays and Guevara never identified Plaintiff or Mr. Almodovar from those alleged photo arrays.

8

46.     Although Saez provided a sworn statement recanting his identification of Plaintiff and Mr. Almodovar prior to Plaintiff's trial, Saez ultimately identified Plaintiff and Mr. Almodovar at trial. Saez later testified that he implicated Plaintiff and Mr. Almodovar in hopes of obtaining favorable treatment from the state regarding his pending violation of probation charge. Assistant Cook County State's Attorney Callahan contacted Saez before Plaintiff's trial and Saez explained that after that conversation it was his understanding that if he testified for the State, he would be released from custody. Saez's probation was in fact terminated on November 30, 1995, two days after his November 28, 1995 trial testimony against Plaintiff.

47.     As a result of Guevara's false statements to Grande that Plaintiff and Mr. Almodovar were the shooters in conjunction with the improper and highly suggestive tactic of showing Grande a single photo of Plaintiff prior to having her identify Plaintiff from a line-up, Grande again identified Plaintiff as one of the shooters consistent with her prior false identification.

48.     Based on the foregoing false and fabricated testimony, a jury convicted Plaintiff of two counts of first degree murder and two counts of attempt first degree murder.

**Defendant Guevara's History of Framing Innocent Persons**

49.     In particular, Defendant Guevara has framed literally dozens of other innocent men over the span of two decades, men who have all lodged independent accusations of similar misconduct against him.

50.     For his part, Defendant Guevara is now refusing to testify about any of his activities as a Chicago police officer on grounds that truthful testimony would subject him to criminal liability.

51.     Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of identified cases in which Guevara has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case.

52.     Given this extensive history, it is apparent that Guevara engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

53.     Regarding his role in framing Plaintiff, Defendant Guevara has asserted his Fifth Amendment right to silence when questioned about every single action he undertook in investigating the Merkes and Rodriguez murders.

54.     Repeatedly, Defendant Guevara has also invoked his Fifth Amendment right not to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below.

55.     Examples of Defendant Guevara's misconduct include:

•     Bill Dorsch is a former Chicago police detective. While serving with the Chicago police department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter. While the first

10

juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who committed the shooting. Dorsch then directed Defendant Guevara to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant Guevara being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

• Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

• In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he

wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

- In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

- Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

- In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

- In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

- In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

- In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara.

- In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

- In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

- In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

- In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

13

- In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

- In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

- In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

- In 1995, Defendant Guevara engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial.

- In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

14

- In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

- In 1997, Defendant Guevara withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Atonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told Guevara that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. Guevara continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key *Brady* material at his trial.

- In 1988, Defendant Guevara used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of murder. In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer. As a result, Rivera received a new trial. Ultimately, the State's

Attorney dropped all charges against Rivera, who was granted a certificate of innocence.

- Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim of that shooting identified Jacques Rivera as his shooter before he died. Defendant Guevara claimed that the identification was made at a time that the victim was in a medically-induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him.

- In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

- In 2011, the first district granted Tony Gonzalez a post-conviction hearing on the basis that Defendant Guevara conducted an unduly suggestive lineup wherein he concocted an array in which Gonzalez's photo was the only one that stood out from the rest in a photo array.

- In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

16

- In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

- In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

- In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

- In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people Guevara was asking about, Guevara repeatedly

17

hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

• In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

• In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

• In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a

18

complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

- In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

- In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement, he could go home.

- In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Defendant Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

- In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez (no relation to Plaintiff) without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to

19

confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

- In 1993, Defendant Guevara arrested fifteen year old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

- In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

- In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only

20

signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

- In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

- In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without *Miranda* warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

- In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

- In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

- In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

- In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

### Plaintiff's Exoneration

56. Throughout his wrongful incarceration, Plaintiff tirelessly fought to prove that he was innocent and wrongfully convicted of the 1994 murders.

57. Plaintiff, through his counsel, filed a post-conviction petition, alleging his actual innocence. An evidentiary hearing was held on the petition during which Plaintiff presented substantial evidence of Guevara's pattern and practice of misconduct. Guevara refused to testify, instead asserting his Fifth Amendment right to remain silent in response to each and every question directed at him. Saez testified that he had never seen the shooters and only identified Plaintiff and Mr. Almodovar because Guevara showed him photos of them and told him they were the offenders and to identify them from the live line-up.

58. While the evidentiary hearing proceeded, the City hired former United States Attorney Scott Lassar of Sidley & Austin to investigate Guevara's longstanding pattern of misconduct.

59. Mr. Lassar determined that Guevara had likely committed misconduct, and numerous people had been wrongfully convicted in cases he investigated, including Roberto

Almodovar, Jose Montanez, Armando Serrano, Robert Bouto, Arturo Reyes and Gabriel Solache.

60.     Prior to a ruling from the circuit court judge, the office of the Cook County State's Attorney consented to granting Plaintiff and Mr. Almodovar's post-conviction petitions on the grounds that newly discovered evidence was of such a conclusive character that it would probably change the result on retrial. The Cook County State's Attorney then moved to vacate Plaintiff and Mr. Almodovar's convictions and *nolle prosequi* all charges.

61.     With no objection from the State, the Honorable Leroy Martin, Jr. granted Plaintiff (and Mr. Almodovar) a Certificate of Innocence on November 20, 2017.

## COUNT I – 42 U.S.C. § 1983
### Due Process: Fabrication of Evidence

62.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

63.     As described more fully above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by fabricating testimonial inculpations of Plaintiff, as well as other evidence.

64.     In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony implicating Plaintiff in the crime that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

65.     Defendants' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth

Amendment. Absent this misconduct, Plaintiff's prosecution could not and would not have been pursued.

66.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

67.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

68.     The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below, in Count VI.

## COUNT II – 42 U.S.C. § 1983
### Due Process: *Brady* Violations

69.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

70.     As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by withholding and suppressing exculpatory evidence. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from the prosecution, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

71.     In addition, in the manner described more fully above, the Defendant Officers knowingly fabricated and solicited false evidence implicating Plaintiff in the crime; obtained Plaintiff's conviction using that false evidence; withheld truthful and exculpatory accounts of how they fabricated evidence; withheld exculpatory written accounts of exculpatory witness

24

statements; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

72.     The Defendant Officers' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

73.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

74.     As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**75.**     The misconduct described in this Count by was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III – 42 U.S.C. § 1983**
**Malicious Prosecution**

76.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

77.     In the manner described more fully above, the Defendant Officers individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional rights.

78.     The Defendant Officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any

25

probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the
procedural and substantive due process components of the Fourteenth Amendment.

79.     In so doing, the Defendant Officers caused Plaintiff to be unreasonably seized and
improperly subjected to judicial proceedings for which there was no probable cause. These
judicial proceedings were instituted and continued maliciously, resulting in injury.

80.     The Defendant Officers subjected Plaintiff to unauthorized and arbitrary
governmental action that shocks the conscience in that Plaintiff was deliberately and
intentionally framed for a crime of which he was totally innocent, through the Defendant
Officers' fabrication, suppression, and withholding of evidence.

81.     As a result of the misconduct of the Defendant Officers described in this Count,
Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain
and suffering, and other grievous and continuing injuries and damages.

82.     The misconduct described in this Count by the Defendant Officers was
undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner
more fully described below in Count VI.

### COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

83.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

84.     Defendants, acting in concert with other co-conspirators, known and unknown,
reached an agreement among themselves to frame Plaintiff for a crime he did not commit and
deprive him of his constitutional rights by maliciously causing Plaintiff's prosecution, by
fabricating evidence that would be used to convict Plaintiff; and by withholding exculpatory
information from Plaintiff's defense and the prosecution, as described above.

85.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

86.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

87.     The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

88.     As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT V – 42 U.S.C. § 1983
### Failure to Intervene

89.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

90.     During the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

91.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

92.     As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

93.     The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT VI – 42 U.S.C. § 1983
### Municipal Liability

94.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

95.     As described more fully herein, the City of Chicago is itself liable for the violation of Plaintiff's constitutional rights. Plaintiff's injuries were caused by the policies, practices, and customs of the Chicago Police Department, in that employees and agents of the Chicago Police Department, including Defendants in particular, regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

96.     This institutional desire to close cases through abusive tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

97.     The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the Chicago Police Department, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the above-described widespread practices were allowed to flourish because the Chicago Police Department declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

98.     The constitutional violations described in this Complaint were also undertaken pursuant to the policy and practices of the Chicago Police Department in that the constitutional violations were committed with the knowledge or approval of persons with final policymaking authority for City of Chicago and the Chicago Police Department.

99.     Chicago police officers who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs.  Thus, this system caused abuses, such as the misconduct here.

100.     The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT VII – State Law Claim
### Intentional Infliction of Emotional Distress

101.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

102.     In the manner described more fully above, Defendants engaged in extreme and outrageous conduct.

103.     The Defendants either intended that their conduct would cause severe emotional distress to Plaintiff or knew that there was a high probability that their conduct would cause severe emotional distress to Plaintiff.

104.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

105.     As a proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including but not limited to severe emotional distress.

## Count VIII – State Law Claim
## Malicious Prosecution

106.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

107.    All of the Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

108.    The Defendants accused Plaintiff of murdering Rodrigo Vargas, knowing that he was innocent of the crime. All of the individual Defendants fabricated evidence, manipulated the only witnesses and withheld material exculpatory evidence. The law enforcement officer Defendants knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

109.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

110.    As a direct and proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## Count IX – State Law Claim
## Respondeat Superior

111.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

112.    In committing the acts alleged in the preceding paragraphs, the Defendants were agents of the City of Chicago acting at all times within the scope of their employment.

113.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT VI – State Law Claim**
**Civil Conspiracy**

114.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

115.    As described more fully in the preceding paragraphs, each of the individual Defendants acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

116.    In furtherance of the conspiracy, the Defendants each committed overt acts and were otherwise willing participants in joint activity.

117.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

118.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**Count XI – State Law Claim**
**Indemnification**

119.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

120.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

121.    The Defendant Officers are or were employees of the Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

122.    The City is liable to indemnify any compensatory judgment awarded against the Defendant Officers.

**WHEREFORE**, Plaintiff WILLIAM NEGRON, prays this Court enter judgment in his favor and against Defendants REYNALDO GUEVARA, ERNEST HALVORSEN, MARK OLSZESKI, EDWARD MINGEY, and the CITY OF CHICAGO, awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff, WILLIAM NEGRON, hereby demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

/s/    Russell Ainsworth
*Attorney for Plaintiff*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Ruth Z. Brown
LOEVY & LOEVY
311 N Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900