**IN THE UNITED STATES DISTRIC COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERTO ALMODOVAR, JR. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-2341 |
| | ) | |
| v. | ) | Honorable Joan B Gottschall |
| | ) | |
| REYNALDO GUEVARA, ET. AL. | ) | Magistrate M. David Weisman |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| WILLIAM NEGRON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-2701 |
| | ) | |
| v. | ) | Honorable Joan B Gottschall |
| | ) | |
| REYNALDO GUEVARA, ET. AL. | ) | Magistrate M. David Weisman |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE CITY OF CHICAGO'S**
**MOTION TO BIFURCATE *MONELL* CLAIMS**

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

ARGUMENT ........................................................................................................................... 6

   I.    THE CITY'S LIABILITY DOES NOT DEPEND ON INDIVIDUAL LIABILITY, AND A TRIAL ON THE MONELL CLAIMS WILL CERTAINLY TAKE PLACE ............................ 7

   II.   BIFURCATION WILL DUPLICATE THE PROCEEDINGS, WASTE RESOURCES, AND INCONVENIENCE WITNESSES ....................................................................... 11

      A.   Defendants' Proposal Would Massively Waste Resources ....................................... 11

      B.   The City greatly exaggerates the burden of Monell discovery. ................................. 13

   III.  THE BALANCE OF PREJUDICE WEIGHS AGAINST BIFURCATION ....................... 15

   IV.  BIFURCATION WOULD VIOLATE THE SEVENTH AMENDMENT .................... 17

   V.   THE CITY'S PROPOSED "LIMITED CONSENT TO ENTRY OF JUDGMENT" IS PROCEDURALLY IMPROPER AND SHOULD BE IGNORED ............................... 18

   VI.  STRONG NON-ECONOMIC INTERESTS WEIGH AGAINST BIFURCATION ...18

CONCLUSION ...................................................................................................................... 19

## TABLE OF AUTHORITIES

### CASES

*A.L. Hansen Mfg. v. Bauer Products*, 2004 WL 1125911 (N.D. Ill. May 18, 2004) -------------------------- 6

*Ackerman v. Allen*, No. 16 C 6199, 2017 WL 1536447 (N.D. Ill. Apr. 27, 2017),------------------------10

*Andersen v. Chicago*, 2016 WL 7240765 (N.D. Ill. Dec. 14, 2016) ----------------------------------------10

*Arrington v. City of Chicago,* 2018 WL 3861552, (N.D. Ill. Aug. 14, 2018),--------------------------------10

*Awalt v. Marketti*, 2014 WL 1161500, (N.D. Ill. Apr. 9, 2012), --------------------------------- 6, 7, 12, 16

*Bell v. Chicago*, 2010 WL 432310, (N.D. Ill. Feb.3, 2010) ------------------------------------------------13

*Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999)------------------------------------------------------------17

*Bonds*, 2018 WL 1316720 (N.D. Ill. Mar. 14, 2018);--------------------------------------------------------- 7

*Bouto v. Guevara,* No. 19 C 2441 (N.D. Ill.) ------------------------------------------------------------------14

*Cadiz v. Kruger*, 2007 WL 4293976 (N.D. Ill. Nov. 29, 2007) --------------------------------------------12

*Cadle v. City of Chicago*, No. 15 C 4725, 2015 WL 6742070, (N.D. Ill. Nov. 2, 2015) --------------------15

*Cage v. Chicago*, 2010 WL 3613981 (N.D. Ill. Sep. 8, 2010)---------------------------------------7, 9, 11

*Castano v. American Tobacco*, 84 F.3d 734, 751 (5th Cir. 1996) ------------------------------------------17

*City of Los Angeles v. Heller*, 475 U.S. 706 (1986) ------------------------------------------------------- 7

*Clarett v. Suroviak*, No. 09 C 6918, 2011 WL 37838 (N.D. Ill. Jan. 3, 2011), --------------------------7, 10

*Clipco*, 2005 WL 2861032 ----------------------------------------------------------------------------------16

*Coleman v. Peoria*, 2016 WL 5497363 (C.D. Ill. Sep. 27, 2016) ------------------------------------------13

*Evans v. Chicago*, 2010 WL 3075651 (N.D. Ill. Aug. 5, 2010)---------------------------------------------- 7

*Fields*, 2017 WL 4553411 --------------------------------------------------------------------------------9, 14

*Gomez v. Guevara*, 18 C 3335 (N.D. Ill), D.E. 65 ---------------------------------------------------- 9, 14, 16

*Harris v. City of Chicago*, 2016 WL 3261522, (N.D. Ill. 2016), --------------------------------------------10

*Haven v. Polksa*, 215 F.3d 727, 732 (7th Cir. 2000)------------------------------------------------------18

*Houseman v. U.S. Aviation*, 171 F.3d 1117, 1121 (7th Cir. 1999). ------------------------------------6, 16

*Houskins v. Sheahan*, 549 F.3d 480, 496 (7th Cir. 2008) ------------------------------------------------13

*Krocka v. Chicago*, 203 F.3d 507, 516 (7th Cir. 2000) --------------------------------------------------- 6

*Martinez v. Cook County*, 2011 WL 4686438 (N.D. Ill. Oct. 4, 2011------------------------------------7, 11

*Matter of Rhone-Poulenc Rorer*, 51 F.3d 1293, 1303 (7th Cir. 1995)------------------------------------17

*Maysonet v. Guevara*, No. 18 C 2342 (N.D. Ill.) ------------------------------------------------------------14

*McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861, 870-71 (7th Cir. 1994) ------------------------16

*Medina v. Chicago*, 100 F. Supp. 2d 893, 896 (N.D. Ill. 2000)----------------------------------------19

*Mitchell v. City of Chicago*, 18 C 7357, (N.D. Ill. Sept. 18, 2019),-----------------------------------10

*Monell v. New York Dept. of Social Services,* 436 U.S. 658 (1978) ----------------------------- passim

*Monterey v. Del Monte Dunes at Monterey*, 526 U.S. 687, 727 (1999) ----------------------------------18

*Ott v. Milwaukee*, 2010 WL 5095305 (E.D. Wis. Dec. 8, 2010);--------------------------------------7, 16

*Owen*, 445 U.S. ----------------------------------------------------------------------------------------18

*Pickett v. Dart*, 2014 WL919673 (N.D. Ill. Mar. 10, 2014) --------------------------------------------7

*Ratliff v. Chicago*, 2012 WL 5845551 (N.D. Ill. Nov. 19, 2012). ------------------------------------16

*Real v. Bunn-O-Matic*, 195 F.R.D. 618, 619 (N.D. Ill. 2000) -----------------------------------------6

*Reyes* & *Solache v. Guevara*, Nos. 18 C 1028 & 18 C 2312 (N.D. Ill.) --------------------------- 10, 14

*Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill. May 18, 2018) ------------------------------------6, 9, 14

*Rodriguez v. Guevara*, No. 18 C 7951, D.E. 61 (N.D. Ill. Sept. 10, 2019),-----------------------10, 14, 15

*Sierra v. Guevara*, No. 18 C 3029 (N.D. Ill.) ----------------------------------------------- 9, 14, 15

*Swanigan v. Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) -----------------------------------------7, 19

*Smith v. Burge*, No. 16 C 3404, Dkt. 205 (N.D. Ill. Aug. 9, 2018);-------------------------------6, 19

*Taylor v. Kachiroubas*, 2013 WL 6050492 (N.D. Ill. Nov. 15, 2013)----------------------------------10

*Terry v. Cook County*, 2010 WL 2720754, at *1-3 (N.D. Ill. July 8, 2010, ------------------------- 7, 16, 17

*Thomas v. Cook County*, 604 F.3d 293, 305 (7th Cir. 2009) -----------------------------------6, 7, 11, 13

*Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 635 (7th Cir. 2018) --------------------------16

*U.S. v. Gomez*, 763 F.3d 845, 860-61 (7th Cir. Aug. 8, 2014)---------------------------------------16

*Veal v. Kachiroubas*, 2014 WL 321708 (N.D. Ill. Jan. 29, 2014) -----------------------------------10

*Wells v. Coker*, 2014 WL 716518 (C.D. Ill. Feb. 25, 2014); ----------------------------------------7

*Williams v. Chicago*, 2018 WL 2561014, (N.D. Ill. June 1, 2018), ---------------------------------10

*Wyatt v. Cole*, 504 U.S. 158, 161 (1992) -----------------------------------------------------------18

## STATUTES

42 U.S.C. § 1983 -------------------------------------------------------------------------- 18, 19

9A FEDERAL PRACTICE AND PROCEDURE § 2391 (2016)----------------------------------------------17

FED. R. CIV. P. 42(b) -------------------------------------------------------------------------- 6

FED. R. EVID. 105 ------------------------------------------------------------------------------16

FEDERAL PRACTICE & PROCEDURE § 2388 (2016) ------------------------------------------------- 6

Federal Rule of Civil Procedure 7(a). ------------------------------------------------------------------- 199

Fed. R. Civ. P. 16 ------------------------------------------------------------------------------------------18

Fed. R. Civ. P. 68 ------------------------------------------------------------------------------------------18

Plaintiff, Roberto Almodovar, Jr., by and through his attorney Jennifer Bonjean and Plaintiff William Negron, by and through his attorneys Loevy & Loevy, respectfully file this response in opposition to the City of Chicago's ("the City") motion to bifurcate. [D.E. 49]

## INTRODUCTION

Robert Almodovar and William Negron ("Plaintiffs") spent over two decades in a maximum security prison for a crime they did not commit. Mr. Almodovar, who was 19 years old at the time of his arrest, was found eligible for the death penalty. After an extensive post-conviction evidentiary hearing, the office of the Cook County State's Attorney vacated Plaintiffs' convictions and dismissed the charges against them. Both Plaintiffs subsequently received Certificates of Innocence. Even the City's own internal investigation conducted by Sidley & Austin in 2015 concluded that Plaintiff was more likely than not innocent. Plaintiffs are among dozens of men who have suffered the same fate in cases investigated by the Chicago Police Department, including 20 men who have recently been exonerated after being framed by Defendant Reynaldo Guevara and his Area Five colleagues. Collectively, these men lost two centuries of their lives.

Ignoring the astounding pattern of exonerations involving Hispanic men wrongfully arrested and prosecuted in the 1990s by Area Five detectives, the City attempts to minimize the incredible pattern that has emerged. Plaintiffs have already developed a mountain of evidence showing that these Area Five wrongful convictions are not isolated incidences of misfortune – or even the acts of a single rouge officer. Rather, the policies and practices of the Chicago police department are the moving force behind the Chicago police department's coordinated effort to frame Hispanic men in the Humboldt Park community in the 1990.

The City hopes to prevent discovery into the practices of the department that led to Plaintiffs' wrongful convictions and the wrongful convictions of dozens of similarly situated men, and it asks the Court to exercise its discretion in a way that is highly disfavored in this District: to

bifurcate Plaintiffs' *Monell* claims during discovery and at trial. The City has no right to sit out a case that concerns deeply troubling scandals in the Chicago Police Department—namely, systematic misconduct by Guevara and his colleagues and a decades-long practice of suppressing exculpatory materials in street files. For the reasons that follow, bifurcation is unwarranted.

## BACKGROUND

Plaintiffs were wrongly convicted of the 1994 murders of Amy Merkes, Jorge Rodriguez, and the attempted murders of Kennelly Saez and Jacqueline Grande. [Almodovar D.E. 1 at ¶1] Plaintiffs were framed by a notorious trio of Area Five officers, Defendant Guevara, his partner Ernest Halvorsen, and their hands-on supervisor Defendant Mingey. These defendants worked hand and glove with Defendant Olszewski, a gang tactical officer, who harbored personal animus against Plaintiff Almodovar's family, repeatedly harassed Almodovar in the year leading up to his arrest, and threatened to frame Almodovar. *Id.* at ¶¶19-26

**The Shooting**

At around 12:45 a.m. on September 1, 1994, Kennelly Saez was talking with three friends, Jorge Rodriguez, Amy Merkes, and Jackie Grande outside his building at 3920 W. Cortland in Chicago. [D.E. ¶¶33-37] Saez and Rodriguez were members of the Maniac Latin Disciples street gang ("MLD"). The MLDs were purportedly at odds with a number of gangs, including the Insane Dragons. According to Saez, he lived on a "neutral corner." *Id.* at ¶36.

As the quartet sat outside chatting, a blue Oldsmobile containing three (3) people drove by. The car pulled into alley, pulled out in reverse, and drove back to the front of Saez's building. *Id.* at ¶38. Saez approached the car and got as far as the sidewalk when the rear passenger said, "What's up folks?" When Saez replied, "Who's that?" The rear passenger drew a handgun and began firing.

Saez dove behind a parked car. Grande, Rodriguez, and Merkes were shot as they attempted to take refuge in the building. Rodriguez and Merkes died of their gunshot wounds. Grande was injured with a gunshot wound to her shoulder and back. *Id.* ¶¶39-40.

**The Investigation**

Grande was interviewed on scene by officer Robert Lohman. She described the perpetrators as three Hispanics, 16 to 20 years old, wearing starter jackets. Saez was interviewed at the police station after the shooting and could only describe the offenders as three male Latinos in a blue car. Detective Dembrowki memorialized an interview with Grande at the hospital later that day on September 1, 1994. Grande told detectives (none of the defendants named in this lawsuit) that: (1) the driver was a tall, thin male white Hispanic with dark hair and light complexion; (2) the front passenger was thing, long face, light complexion, black jacket and red had; (3) the back seat occupant (the shooter) was skinny, dark hair, med complexion, clean looking. *Id.* at ¶42. (Ex. C)

According to the investigative file produced by the City, no identification procedures were conducted with Grande on September 1, 1994. Indeed, no investigative conduct was memorialized in connection with the case until *after* Almodovar's arrest on September 13, 1994.[1] (Ex. C)

However, Grande testified during a pre-trial hearing (and at a post-conviction hearing) that she viewed a photo array of 4 to 6 photos at the hospital and that she could not identify anyone from that photo array. Ex. A. at 21-22. Attorney Melinda Powers provided an affidavit (and testified during Plaintiffs' post-conviction proceedings) that she interviewed Grande on April 6, 1995 and that Grande told her that detectives showed her photographs while she was hospitalized and further

---

[1] The City not only had a policy of suppressing documented exculpatory material; it also approved, condoned, and encouraged a practice whereby detectives purposely did *not* memorialize their investigations contemporaneous with investigative conduct to avoid including information that may be exculpatory to the accused or contradict the detectives' theory of the case. Defendant Halvorsen admitted that such a practice existed in an interview with Sidley and Austin on December 28, 2013 when he was questioned about his failure to contemporaneously report an interview with a key witness in another case. Halvorsen explained that they were reluctant to file an official report prior to "verifying" the story because "bullshit stays that way" and "forever taints the file."

told her "these are the guys who did it." (Ex. B) Powers maintained her original notes memorializing her April 6, 1995 interview with Grande. *Id.*

The investigative record does not reflect that Grande was ever shown a photo array of suspects at the hospital nor does it show that she failed to make an identification from this photo array. Neither the photo array nor any accompanying reports related to these identification procedures were ever produced to the criminal justice system.

**Mingey Assigns Guevara and Halvorsen to the Case**

After the original detectives submitted their supplemental report on September 1, 1994. Defendant Mingey assigned Guevara and Halvorsen to the investigation. Mingey routinely assigned Guevara and Halvorsen to cases, knowing that they would quickly close the case by employing improper investigative methods. [D.E. ¶44]

The Defendants agreed to frame a member(s) of the Insane Dragons street gang since the victims were MLD members – a rival gang. Defendant Olszewski proposed the perfect candidate – Plaintiff Almodovar. As a fellow Insane Dragon associate and friend of Almodovar, Plaintiff Negron was an ideal accomplice. As part of the plan to frame Almodovar, on September 4, 1994, Defendant Olszewski raided Almodovar's cousin's home without securing a search warrant. Olszewski arrested Almodovar for the petty offense of "mob action." Olszewski's arrest of Almodovar was pretextual, conducted for the sole purpose of taking a Poloroid photo of him. *Id.* at ¶¶45-54 Olszewski took Almodovar's photo himself and then provided the photo to Guevara and Halvorsen. *Id.* at ¶¶54-55.

The following day on September 5, 1994, Guevara and Halvorsen went to Grande's home (she was discharged from the hospital on September 3, 1994) and showed Grande a photo array that included the Poloroid photo of Almodovar and a photo of William Negron. (Ex. C) According to a closing supplemental report prepared by Halvorsen on September 13, 1994 (over a week after the

photo array was allegedly shown to Grande), Grande identified Almodovar and Negron from the photo array. No GPR or contemporaneous report exists documenting that alleged identification. Furthermore, the investigative record is devoid of any legitimate factual basis for including Almodovar and Negron's photos in the photo array.

Consistent with well-established practice of Area Five detectives, Defendant Guevara and Halvorsen procured false identifications of Plaintiffs from Grande and Saez by a tried and true method – that is – by telling the young, vulnerable victims that the police "investigation" showed that Plaintiffs were the offenders, by showing the victims photographs of the Plaintiffs, and by telling them they just needed them to identify Plaintiffs from a line-up to vindicate the murders of their friends and loved ones. [D.E. 1 at ¶¶60-62] Consistent with the department's practices, the investigating detectives took no effort to prepare fair photo arrays that complied with the Chicago Police Department's own written policies or nationally-accepted standards in law enforcement. Indeed, they ignored every known and widely-accepted identification procedure because their goal was to secure a false identification – not an accurate one. The City encouraged this practice.

Guevara has pleaded his Fifth Amendment right not to incriminate himself in response to questions about his misconduct during the Merkes/Rodriguez investigation. Saez has testified consistently for two decades that he only identified Plaintiffs because Guevara showed him photos of the men, reassured him that they were the offenders, and told him to identify them from the line-up. On April 14, 2017, the State's Attorney moved to vacate Plaintiffs' conviction and dismissed the charges against them. [D.E. 1 at ¶6]. Plaintiffs spent 23 years in prison as a result of Defendants' misconduct. *Id.* at ¶1.

Plaintiffs' wrongful conviction was also caused by the City's policies and practices. *Id.* ¶¶ 175-196. Evidence suggests that all reports and photo arrays associated with identification procedures conducted with Grande at the hospital were suppressed or concealed. The Defendant

officers fabricated false identifications from Saez and Grande, and the individual Defendants acted pursuant to City policy. *Id.* In addition, the City failed to train, supervise, and discipline its officers, particularly Guevara —who engaged in a pattern of misconduct resulting in at least 18 wrongful convictions. *Id.*

## ARGUMENT

This Court has discretion to decide particular claims or issues in separate trials "[f]or convenience, to avoid prejudice, or to expedite and economize." FED. R. CIV. P. 42(b); *Krocka v. Chicago*, 203 F.3d 507, 516 (7th Cir. 2000). The Court must "be satisfied that the decision to bifurcate does not unfairly prejudice the non-moving party." *Houseman v. U.S. Aviation*, 171 F.3d 1117, 1121 (7th Cir. 1999). Bifurcation is the exception, not the rule, and separate trials should not be ordered "unless such a disposition is clearly necessary." *Real v. Bunn-O-Matic*, 195 F.R.D. 618, 619 (N.D. Ill. 2000); *see also* FED. R. CIV. P. 42(b), advisory cmts. ("[S]eparation of issues for trial is not to be routinely ordered[.]"); 7 FEDERAL PRACTICE & PROCEDURE § 2388 (2016) ("The piecemeal trial of separate issues in a single lawsuit or the repetitive trial of the same issue in severed claims is not to be the usual course."); *A.L. Hansen Mfg. v. Bauer Products*, 2004 WL 1125911, at *2 (N.D. Ill. May 18, 2004) ("[T]he decision to bifurcate centers on a balance of equities. However, this balance is weighted against bifurcation."). In considering bifurcation, the court "should remain mindful of the traditional role of the factfinder; *i.e.* to make an ultimate determination on the basis of a case presented in its entirety." *Real*, 195 F.R.D. at 620. Since the Seventh Circuit decided *Thomas v. Cook County*, 604 F.3d 293, 305 (7th Cir. 2009), "the weight of authority holds that bifurcation is now heavily disfavored," *Awalt v. Marketti*, 2014 WL 1161500, at *10 n.2 (N.D. Ill. Apr. 9, 2012), particularly in cases like this.[2] The City has provided no justification for bifurcation.

---

[2] *See Smith v. Burge*, No. 16 C 3404, Dkt. 205 (N.D. Ill. Aug. 9, 2018); *Rivera v. Guevara*, No. 12 C 4428, Dkt. 443 (N.D. Ill. May 18, 2018); *Hood v. Chicago*, No. 16 C 1970, Dkt. 86 (N.D. Ill. Jan. 9, 2017); *Estate of Loury*, 2017 WL 1425594, at *5 (N.D. Ill. Apr. 20, 2017); *Estate of McIntosh v. Chicago*, 2015 WL 5164080 (N.D. Ill. Sep. 2, 2015); *King v.

## I.    THE CITY'S LIABILITY DOES NOT DEPEND ON INDIVIDUAL LIABILITY, AND A TRIAL ON THE MONELL CLAIMS WILL CERTAINLY TAKE PLACE

The City's central argument is that its own liability depends on a jury first finding individual liability. [D.E. 49 at 6-7] That is incorrect on the law and the facts.

"The actual rule," the Seventh Circuit said in *Thomas*, is that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." 604 F.3d 293, 305 (7th Cir. 2010); *see also Swanigan v. Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("In some civil-rights cases, . . . a verdict in favor of individual defendants would not necessarily be inconsistent with a plaintiff's verdict on a factually distinct *Monell* claim."). Judges in this District analyze the propriety of bifurcation bearing in mind that a municipal policy can cause a constitutional deprivation even if a jury finds the individual officers not liable. *See Bonds*, 2018 WL 1316720, at *4-5 (N.D. Ill. Mar. 14, 2018); *Pickett v. Dart*, 2014 WL.919673 (N.D. Ill. Mar. 10, 2014); *Wells v. Coker*, 2014 WL 716518 (C.D. Ill. Feb. 25, 2014); *Martinez*, 2011 WL 4686438, at *1; *Cage*, 2010 WL 3613981, at *1; *Evans v. Chicago*, 2010 WL 3075651 (N.D. Ill. Aug. 5, 2010). Cases like this one, where a jury could find a policy caused a constitutional deprivation without finding misconduct by a particular officer, are different in kind from cases where municipal liability is premised on a particular officer's use of force, such as *City of Los Angeles v. Heller*, 475 U.S. 706 (1986).

Even prior to nearly all of the discovery in this case, Plaintiff's *Monell* theories include that the City had a policy or practice of concealing documentary, exculpatory evidence from criminal defendants, commonly referred to as a "street files" theory. [D.E. 1 at ¶¶177, 179, 187] [*Negron* D.E. 1 at ¶¶95-96] Ex. D - City's Resp. to Pl.'s Requests for Production, at Nos. 40 & 43 (requesting the

---

*Evans*, 2015 WL 4397761, at *2 (N.D. Ill. July 17, 2015); *Wells v. Coker*, 2014 WL 716518 (C.D. Ill. Feb. 25, 2014); *Giles v. Ludwig*, 2013 WL 6512683 (N.D. Ill. Dec. 6, 2013); *Allison v. Gallagher*, 2012 WL 4760863, at *2 (N.D. Ill. Oct. 5, 2012); *Awalt*, 2012 WL 1161500; *Martinez v. Cook County*, 2011 WL 4686438, at *3-4 (N.D. Ill. Oct. 4, 2011); *Carter v. Dart*, 2011 WL 1466599, at *2-5 (N.D. Ill. Apr.18, 2011); *Clarett v. Suroviak*, 2011 WL 37838, at *1-3 (N.D. Ill. Jan. 3, 2011); *Ott v. Milwaukee*, 2010 WL 5095305, at *2 (E.D. Wis. Dec. 8, 2010); *Cage v. Chicago*, 2010 WL 3613981, at *2 (N.D. Ill. Sep. 8, 2010); *Terry v. Cook County*, 2010 WL 2720754, at *1-3 (N.D. Ill. July 8, 2010); *Bell v. Chicago*, 2010 WL 432310, at *2-4 (N.D. Ill. Feb.3, 2010); *Bradley v. Chicago*, 2010 WL 432313 (N.D. Ill. Feb.3, 2010).

City's policies and training on "disclosing exculpatory evidence to suspects, criminal defendants, or prosecutors, including through the subpoena response unit"). A jury might find that the individual defendants put investigative materials where they were supposed to in police department files, but that the City had no mechanism for ensuring those files were turned over to Plaintiff or the attorneys involved in his criminal prosecution. This is particularly so because the Defendant Officers (other than Guevara, who has pled the Fifth) have already denied that they deliberately suppressed exculpatory evidence. [D.E. 29 -Def. Officers' Answer to Compl. at ¶149]

One example illustrates the point: during the relevant time period, the City responded to requests for documents from prosecutors and to subpoenas sent by criminal defendant attorney through the Subpoena Service Unit, which sometimes would (but sometimes would not) gather investigative materials from the detective Areas and other units of the Chicago Police Department where files were kept. No written policies governed that unit, and the civilian personnel working there received no training. As a result, one systemic problem in the relevant time frame was that the City failed to produce important investigative materials to the criminal justice system. The jury might find this City policy prevented Plaintiffs from receiving important investigative materials (*e.g.,* reports or other documentary evidence related to identification procedures conducted with Grande prior to September 5, 1994), even if the individual Defendants did not intentionally suppress evidence or have any personal responsibility for the constitutional violations. The Defendant Officers (other than Guevara, who has pled the Fifth) have already denied that they deliberately suppressed exculpatory evidence, underscoring the possibility that a jury could credit their denials but still find that City policy caused evidence suppression, and in turn, Plaintiffs' injuries.

In such a case, a *Monell* verdict reflecting that the City's file-keeping system prevented disclosure of exculpatory investigative materials to Plaintiff would be consistent with a verdict that no individual Defendant bore personal responsibility for evidence suppression. Indeed, the City lost

a *Monell* verdict recently in *Rivera*, which presented the same *Monell* street-files theory at issue here,
even though the jury found that an individual defendant detective was not liable for suppressing
evidence. The due-process verdict against the City in *Rivera* was independent of the jury's findings
with respect to the individual defendants. *Rivera*, No. 12 C 4428, D.E. 671 at 26 (jury instructions);
*see also*, e.g., Ex. E - *Gomez v. Guevara*, 18 C 3335 (N.D. Ill), D.E. 65 at 6-7. Similarly, the jury
returned a *Monell* street-files verdict against the City in *Fields* that was independent of liability against
any individual officer. *See Fields*, 2017 WL 4553411, at *3-4; *Fields*, No. 10 C 1168, D.E. 1169 at 14-
15 (jury instructions). Plaintiffs intend to pursue this same theory, as evidenced by his discovery
requests—particularly in light of the Defendant Officers' defenses that they did not knowingly
suppress exculpatory information.

Numerous courts have reached the same conclusion in street files cases. For example, in
*Gomez v. Guevara*, the court explained:

> [T]he jury could presumably find that the Defendant Officers put the evidence in its proper
> place . . . , but that the City had no mechanism for guaranteeing that those files were turned
> over in the litigation process. This finding would not be contingent on the jury determining
> that the individual officers intentionally suppressed evidence.

Ex. E at 6. Likewise, the court in *Cage* reasoned:

> The Plaintiff's theory of *Monell* liability is that the City had a policy of not providing
> exculpatory lab evidence to the defense and that evidence that was inconsistent with the
> prosecution's theory of the case was also not explored. It is early in discovery and too early
> to determine who was aware of this alleged practice and who may have followed it
> unwittingly. For example, under this theory, it might be possible that a prosecutor and law
> enforcement officer continued to press charges not knowing that they were not being
> provided such exculpatory evidence. In such a circumstance, it might be possible for a jury
> to find that the officer and prosecutor acted unknowingly while in turn finding that the
> City's lab policy was unconstitutional.

*Cage*, 2010 WL 3613981, at *2; *see also, Sierra*, No. 18 C 3029, D.E. 154 ("The Court is not persuaded
that the *Monell* claims add zero additional relief or monetary value to plaintiff's case. . . . Success on
the *Monell* theory is possible without succeeding on other legal claims, or the City might be found
liable for violating constitutional rights while individual Defendants enjoy qualified immunity.")

(quotations and alteration omitted); Ex. F, *Reyes*, Trans. of April 24, 2019 Hrg., at 4 ("[A]t this point I can't make a determination that the *Monell* liability is necessarily dependent on the individual liability. I think there are theories that would not make that the case, . . . [and] there should be an opportunity to suss that out . . ."); *Rodriguez v. Guevara*, No. 18 C 7951, D.E. 61 (N.D. Ill. Sept. 10, 2019), at 3-4 n.1.

Thus, Plaintiffs case differs from most of the cases cited by the City, such as *Veal v. Kachiroubas*, 2014 WL 321708, at *4 (N.D. Ill. Jan. 29, 2014), and *Mitchell v. City of Chicago*, 18 C 7357, (N.D. Ill. Sept. 18, 2019), which addressed coerced confessions; *Taylor v. Kachiroubas*, 2013 WL 6050492, at *1, 4 (N.D. Ill. Nov. 15, 2013), and *Harris v. City of Chicago*, 2016 WL 3261522, at *3 (N.D. Ill. 2016), which addressed coerced confessions and the fabrication of evidence; *Clarett*, No. 09 C 6918, 2011 WL 37838, at *1 (N.D. Ill. Jan. 3, 2011), which concerned a traffic stop and false arrest (and actually denied the motion to bifurcate); and *Ackerman v. Allen*, No. 16 C 6199, 2017 WL 1536447 (N.D. Ill. Apr. 27, 2017), and *Arrington v. City of Chicago,* 2018 WL 3861552, at *1 (N.D. Ill. Aug. 14, 2018), which addressed excessive force claims.

The sole cases cited by the City addressing street files theories of *Monell* liability—Judge Kendall's decisions in *Andersen v. Chicago*, 2016 WL 7240765, at *3-4 (N.D. Ill. Dec. 14, 2016), and *Williams v. Chicago*, 2018 WL 2561014, *11-12 (N.D. Ill. June 1, 2018), and Judge Shah's decision in the *Montanez/Serrano* litigation—misunderstand the street-files theory. In those cases, Judges Kendell and Shah believed that the *Monell* street-files theory depended on an individual defendant intentionally suppressing the street file. As explained above, the theory does not depend on individual misconduct. Instead, the City's failure *to transmit* street files to the criminal justice system was a matter of City policy, which deprived criminal defendants of needed investigative materials, even in the absence of knowing individual misconduct. While individual police officers always create the documents that end up in a suppressed street file, constitutional violations occurred because the

City had no mechanism to ensure that the street files were handed over to the defense. Accordingly, a finding that individual officers did not suppress evidence would not foreclose *Monell* liability.

Moreover, the City can be liable for constitutional violations caused by municipal policies even if individual officers are afforded qualified immunity. Though that argument is not necessary to deny bifurcation, it has force here, as the Defendant Officers have asserted immunity defenses. If immunity is available to the individuals, then that, too, is a way that the City might be liable even if the individuals are not, creating the possibility of inconsistent verdicts and complicating the jury instructions. *Thomas*, 604 F.3d at 305; *Bell*, 2010 WL 432310, at *3; *Martinez*, 2011 WL 4686438, at *2; *Cage*, 2010 WL 3613981, at *1.

*Monell* liability does not depend on individual liability, a verdict for the individuals will not necessarily dispose of the *Monell* claims, and a trial on those claims will be necessary no matter what. The relationship between the individual and municipal claims in this case weighs against bifurcation.

## II. BIFURCATION WILL DUPLICATE THE PROCEEDINGS, WASTE RESOURCES, AND INCONVENIENCE WITNESSES

Because the *Monell* claims in this case will be tried no matter what, Defendants' proposal means there would be two separate cases tried consecutively. That approach would multiply the proceedings, impose huge costs on the Court and the parties, and inconvenience the witnesses—all with very little benefit. These factors also weigh heavily in favor of denying bifurcation.

### A. Defendants' Proposal Would Massively Waste Resources

If Defendants' proposed bifurcation was adopted, the parties would engage in two separate rounds of discovery—the first to develop the record necessary for the individual case, and the second to supplement that record with evidence necessary for the *Monell* claims. That would mean two depositions of Defendants and most other fact witnesses (one to ask them about their role in the individual case, and a second to ask questions relevant to City policies and practices). These

11

witnesses would literally have to be produced for their depositions on two separate occasions, months (or likely years) apart. There would be two rounds of written discovery. Two rounds of Rule 30(b)(6) depositions (because some topics on which City testimony is necessary will pertain to both the individual and *Monell* cases and other topics will relate solely to *Monell*). Two rounds of expert reports, discovery, and depositions. And during these rounds of discovery there would be motion practice as disputes arose between the parties.

Following each round of discovery, there would be dispositive motions for the Court to resolve. Perhaps without municipal claims in the case, the individual Defendants would decide to slow the process down further by taking a qualified-immunity appeal from the denial of their motions for summary judgment. After that, there would be two rounds of briefing on *Daubert* motions, two separate filings of motions *in limine* (with responses and replies), two pretrial orders, and two jury instruction conferences. All of this double work would be avoided entirely if it was done once, in a unified proceeding, without bifurcating the *Monell* claims.

Perhaps most importantly, Defendants' plan would require two trials. This would impose a huge burden on the Court, on witnesses, and on the parties. Each witness would be called twice— once to talk about the facts of the individual case, and a second time to talk about the policies of the City, and the way those policies impacted the individual case. Experts would have to fly to Chicago twice to testify, at great expense to the parties. Exhibits would be introduced against the individual Defendants and then re-introduced against the City in the second trial. There would be two rounds of opening arguments and two rounds of closing arguments. Again, each trial would bring another round of motion practice. Courts have decided in these circumstances that bifurcation makes little sense. *Cadiz v. Kruger*, 2007 WL 4293976, at *5 (N.D. Ill. Nov. 29, 2007) (discussing precisely these sorts of problems with assuming that judicial economy is served by bifurcation); *see also Awalt*, 2012 WL 1161500, at *10; *Bell*, 2010 WL 432310, at *4.

Moreover, this massive duplication of proceedings and the attendant years-long delay in resolving the case would have occurred even though much of the evidence relevant to the *Monell* theories is admissible against the individual Defendants at the first trial, and much of the evidence relevant to the individual claims at the first trial must also be presented at the second trial. On the former point, evidence of a municipal policy or practice is probative of whether an individual Defendant engaged in a particular course of conduct consistent with those policies on a particular occasion. *Coleman v. Peoria*, 2016 WL 5497363, at *6 (C.D. Ill. Sep. 27, 2016) (denying bifurcating because *Monell* evidence was "relevant to the actions of the defendant officers, who would, assuredly, claim to have acted in conformity with sanctioned department policies and practices"). On the latter point, *Monell* requires proof that a policy was the moving force behind the constitutional violation, *Thomas*, 604 F.3d at 306, and so the *Monell* trial will require lots of evidence about the underlying crime, investigation, and wrongful conviction, *see Houskins v. Sheahan,* 549 F.3d 480, 496 (7th Cir. 2008) (affirming a decision not to sever claims against two defendants because those claims entailed "an overlap in the facts, evidence, and witnesses required").

Defendants' proposal would increase the burden on the Court and parties, it will multiply the costs of the litigation, and it will inconvenience many third-party witnesses. These burdens would be imposed without any offsetting benefit.

## B.     The City greatly exaggerates the burden of *Monell* discovery.

The City greatly exaggerates the burden of discovery necessary to try the *Monell* claims. Much of what the City will have to produce here—whether written policies, training records, Rule 30(b)(6) testimony, homicide files, or Complaint Register ("CR") files—has already been (or will be) produced in other cases addressing homicide investigations undertaken by Guevara and his Area 5 colleagues. These cases include:

- *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.) (*Monell* claim addressing a 1988 homicide investigation by Area 5 detectives including Guevara found to be meritorious at trial)
- *Maysonet v. Guevara*, No. 18 C 2342 (N.D. Ill.) (*Monell* claim pending that addresses an Area 5 Guevara homicide investigation in 1990, bifurcation not yet adjudicated)
- *Bouto v. Guevara,* No. 19 C 2441 (N.D. Ill.) (*Monell* claim pending that addresses an Area 5 Guevara homicide investigation in 1993, bifurcation not yet adjudicated)
- *Rodriguez v. Guevara*, No. 18 C 7951 (N.D. Ill.) (*Monell* claim pending that addresses an Area 5 Guevara homicide investigation in 1995, bifurcation denied)
- *Sierra v. Guevara*, No. 18 C 3029 (*Monell* claim pending that addresses an Area 5 Guevara homicide investigation in 1995, bifurcation denied)
- *Gomez v. Guevara*, 18 C 3335 (N.D. Ill) (*Monell* claim pending that addresses an Area 5 Guevara homicide investigation in 1997, bifurcation denied)
- *Reyes* & *Solache v. Guevara*, Nos. 18 C 1028 & 18 C 2312 (N.D. Ill.) (*Monell* claim pending that addresses an Area 5 Guevara homicide investigation in 1998, bifurcation denied).

There is no doubt that materials from other cases can be used here. The City complains about discovery into its policies and training materials, but *Rivera* (also a Guevara case) and *Fields* already required thorough discovery on the City's written policies and training materials as well as materials required for an "'in depth analysis of street files claims from 1983-1991 and 1999-2006,'" including a large sample of Area 5 homicide files from 1985-1991. *See Reyes v. Guevara, et al.*, No. 18 C 1028 (N.D. Ill.), Order of Sept. 10, 2019 (D.E. 224), at 17-18 (quotation omitted). The City complains about producing Complaint Register ("CR") and homicide files, but the City has already been ordered to produce in the *Solache/Reyes* litigation all CR files for those detectives who worked at Area Five at any time from 1995-1998 (Ex. F at 18, 23). And in *Sierra*, too, the City is under court order to produce "all CRs opened from 1991-95 against Area Five detectives," as well as all homicide files for Area 5 from the same time period. *Sierra*, D.E. 154, at 3-4.

Additional policy documents, training materials, and homicide and CR files will likely be produced in other pending Guevara cases, such as *Maysonet*, *Bouto*, and *Gomez*, which address investigations of 1990, 1993, and 1997 homicides, respectively. The City has not provided any basis, let alone an affidavit under oath from a City representative with knowledge, upon which this Court could conclude that the incremental burden of conducting *Monell* discovery in *this* case warrants

bifurcation given the extent of production in prior and pending Area 5 cases. *See*, *Rodriguez*, D.E. 51 at 3 & 3-4 n.1 ("the City should have already done much of the necessary groundwork for *Monell* discovery in the other similar cases that are progressing through other courts in this district, which will cut the time, burden, and expense on the City to produce *Monell* discovery."); *Sierra v. Guevara*, Trans. of Nov. 7, 2018 Hrg., at 5 ("[T]he city has been engaged in *Monell* discovery in similar cases. . . . [T]he city certainly has a good start on how it would go about searching for discovery that would be the subject of plaintiff's *Monell* claims."); *Cadle v. City of Chicago*, No. 15 C 4725, 2015 WL 6742070, at *2 (N.D. Ill. Nov. 2, 2015) ("[T]he Court has no doubt that the City has produced similar information in other cases. The incremental burden of doing so again here does not militate heavily in favor of bifurcation.").

At bottom, the City has already been ordered to produce virtually the same documents Plaintiffs' request here. Indeed, this Court recently ordered the City to produce all CRs opened from between 1991 and 1995 and all Area Five homicide files from 1991-1995. *See Sierra*, D.E. 154. The Merkes/Rodriguez murder investigation occurred in 1994. A large bulk of the material sought by Plaintiffs will be produced in *Sierra*. Any additional burden to the City is minor and does not justify bifurcation.

## III.   THE BALANCE OF PREJUDICE WEIGHS AGAINST BIFURCATION

The City also argues that without bifurcation, the Defendants will be prejudiced at trial. This argument is without merit and provides no justification for bifurcation at this stage. The only potential prejudice here is to Plaintiffs if the *Monell* claims are bifurcated.

The argument that *Monell* evidence will prejudice the individual Defendants at trial should be rejected. As discussed already, a substantial portion of the *Monell* evidence will be directly relevant to Plaintiffs' claims against the individuals, and it is therefore not unfairly prejudicial at all. Moreover, even if there was a concern about prejudice to the individual Defendants at trial, that would not

justify bifurcation. Instead, limiting instructions are the established mechanism for managing prejudice. FED. R. EVID. 105 (directing district courts to provide instructions to the jury "restrict[ing] the evidence to its proper scope"); *U.S. v. Gomez*, 763 F.3d 845, 860-61 (7th Cir. Aug. 8, 2014) (*en banc*) (limiting instructions sufficient to manage any prejudice caused by the admission of other-acts evidence, and commenting that "[l]ay people are capable of understanding the foundational principle in our system of justice that we try cases, rather than persons."); *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 635 (7th Cir. 2018) (courts assume jurors follow limiting instructions); *McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861, 870-71 (7th Cir. 1994) (no need to bifurcate to avoid prejudice where it is presumed jury could follow limiting instruction on how to consider the evidence); *Awalt*, 2014 WL 1161500, at *13; *Gomez*, 2014 WL 4058963, at *12.

Finally, any prejudice avoided by bifurcation must be weighed against the prejudice to Plaintiffs. *Houseman*, 171 F.3d at 1121. In this case the only truly unfair prejudice is that which Plaintiffs would suffer if bifurcation was granted. First, because the "claims asserted by Plaintiff are interwoven . . . it would be an unreasonable hardship and completely uneconomical to require proof of virtually the same facts in two separate trials." *Ratliff v. Chicago*, 2012 WL 5845551, at *6 (N.D. Ill. Nov. 19, 2012). Second, bifurcation would cause long delays in the final resolution of Plaintiffs' claims, and it would drive up the cost of the litigation at the end of the day. *Clipco*, 2005 WL 2861032, at *3 (bifurcation inappropriate when it "would result in unnecessary delay, additional expense, or some other form of prejudice"); *Terry*, 2010 WL 2720754, at *2 ("[J]udges in this district have echoed Plaintiff's concerns about delay of the case and possible prejudice to Plaintiff from that delay."). Third, if the case was bifurcated, there would be numerous discovery disputes about what is "*Monell*-only" discovery and what discovery properly pertains to policies and practices that are relevant to Plaintiffs' claims against the individual Defendants. *Ott*, 2010 WL 5095305, at *3 (denying bifurcation because it was "likely that bifurcating discovery in this case will lead to more

disputes as to whether certain discovery requests relate to the permissible individual claims or the impermissible *Monell* claims"). This is precisely the case where bifurcation will "add unnecessary complexity and confusion to the discovery process" and where "discovery disputes are brewing." *Terry*, 2010 WL 2720754, at *3.

The risk of unfair prejudice to Defendants is extremely low, particularly at this stage of the case. On the other hand, the prejudice to Plaintiffs from bifurcation is obvious and pronounced. In such a circumstance, the balance of equities favors a unitary proceeding.

## IV. BIFURCATION WOULD VIOLATE THE SEVENTH AMENDMENT

The City's proposal would require two separate trials, in front of two separate juries, which would both consider the same issues. Most importantly, both juries would be required to consider whether and how Plaintiffs' constitutional rights were violated by the suppression of evidence—the first to assess whether the individual Defendants violated his right to due process, and the second to assess whether the City's policies were the moving force behind that same violation.

The Seventh Amendment prohibits dividing issues in way that requires a second jury to reexamine an issue decided by the first. *Matter of Rhone-Poulenc Rorer*, 51 F.3d 1293, 1303 (7th Cir. 1995) ("[T]he judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries."); *see also Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999) (under the Seventh Amendment, "a given issue may not be tried by different, successive juries"); *Castano v. American Tobacco*, 84 F.3d 734, 751 (5th Cir. 1996) ("The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues. Thus, the Constitution allows bifurcation of issues that are so separable that the second jury will not be called upon to reconsider findings of fact by the first."); 9A FEDERAL PRACTICE AND PROCEDURE § 2391 (2016). Defendants' proposal would violate the Seventh Amendment as well.

## V.     THE CITY'S PROPOSED "LIMITED CONSENT TO ENTRY OF JUDGMENT" IS PROCEDURALLY IMPROPER AND SHOULD BE IGNORED

In an attempt to avoid problems its proposed bifurcation creates, the City attaches what it calls a "Limited Consent to Entry of Judgment" to its motion, by which it states it would accept a judgment against it if the individual Defendants were found to have violated Plaintiffs' constitutional rights but were also entitled to immunity. As the Seventh Circuit has observed recently, this so-called "consent" is not authorized by the Federal Rules of Civil Procedure, and it is therefore procedurally deficient. *Id.* at 959-62. It is not a Rule 68 offer of judgment, because it does not satisfy Plaintiffs' demands. *Id.* It is not a Rule 16 stipulation agreed upon by the parties, both because it does not stipulate to any facts and because Plaintiffs reject it. (That might be different if the City was proposing to stipulate that it had a policy and practice of suppressing exculpatory information in street files during the relevant time period.) Finally, it is not a permissible responsive pleading under Federal Rule of Civil Procedure 7(a). *Haven v. Polksa*, 215 F.3d 727, 732 (7th Cir. 2000). As a result, the Court should disregard the City's proposed consent entirely—it is not something that can be imposed on Plaintiff in order to remove the City from the case.

## VI.     STRONG NON-ECONOMIC INTERESTS WEIGH AGAINST BIFURCATION

Finally, Plaintiffs have a strong non-economic interest in preventing future constitutional violations, particularly wrongful convictions. Deterrence of constitutional misconduct is a fundamental purpose of section 1983. *Owen*, 445 U.S. at 627 ("[Section 1983] was intended not only to provide compensation to victims of past abuses, but to serve as a deterrent against future constitutional deprivations[.]"); *see also Monterey v. Del Monte Dunes at Monterey*, 526 U.S. 687, 727 (1999) ("There is no doubt that the cause of action created by § 1983 is, and was always regarded as, a tort claim . . . it is designed to provide compensation for injuries arising from the violation of legal duties and thereby, of course, to deter future violations."); *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

"Some cases have remedial import beyond the individual plaintiff's claim for monetary damages, and § 1983 provides a vehicle for obtaining other judicial relief against governmental policies that violate constitutional rights." *Swanigan*, 775 F.3d at 962; *Medina v. Chicago*, 100 F. Supp. 2d 893, 896 (N.D. Ill. 2000) ("Deterrence of future misconduct is a proper object of our system of tort liability . . . . Depending on the size of the verdict and the size of the municipality . . . a judgment against a police officer (even one paid for by the municipality) may be less likely to prompt the municipality to act to prevent future violations than a judgment naming the municipality itself as responsible based on its polices and customs."). This case concerns a wrongful conviction caused by City policies that deprived countless men of fair trials and allowed dangerous officers like Guevara to terrorize the community with impunity. The stakes in a civil rights lawsuit will rarely be higher than they are here, and the *Monell* claims at issue are of profound importance to future institutional reform. Courts have recognized that lawsuits like this "can be distinguished from other lawsuits against the City in which district courts have bifurcated *Monell* claims." *Smith*, No. 16 C 3404, D.E. 205, at 2. The strong non-economic objectives of Plaintiffs' lawsuits also weigh against bifurcation.

## CONCLUSION

The City cannot avoid litigation over its role in the misconduct alleged. It is responsible, as much as the other Defendants, for Plaintiffs' wrongful conviction and 23-year imprisonment. Plaintiff is entitled to discovery and a trial against the City. The City's motion should be denied.

RESPECTFULLY SUBMITTED:

/s/ Jennifer Bonjean
*Attorney for Roberto Almodovar*

Jennifer Bonjean
Ashley Cohen
Bonjean Law Group, PLLC
467 St. Johns Place
Brooklyn, New York 11238
718-875-1850

<u>/s/ Russell Ainsworth</u>
*Attorney for William Negron*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Ruth Brown
Rachel Brady
LOEVY & LOEVY
311 North Aberdeen Street
3rd floor
Chicago, IL 60607
(312) 243-5900

**CERTIFICATION OF SERVICE**

I, Jennifer Bonjean, an attorney, hereby certify that on December 6, 2019, I caused the

foregoing Plaintiffs' Joint Response to the City's Motion to Bifurcate to be filed using the Court's

CM/ECF system, which effected service on all counsel of record.

s/JENNIFER BONJEAN