IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERTO ALMODOVAR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18 CV 02341 |
| | ) | |
| v. | ) | Honorable Joan B. Gottschall |
| | ) | Magistrate Judge M. David Weisman |
| REYNALDO GUEVARA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| WILLIAM NEGRON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18 CV 02701 |
| | ) | |
| v. | ) | Honorable Joan B. Gottschall |
| | ) | Magistrate Judge M. David Weisman |
| REYNALDO GUEVARA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

JOINT STATUS REPORT

Pursuant to this Honorable Court's September 15, 2022, Minute Entry, Dkt. 193, the Parties in the above-captioned matter submit this joint status report to inform the court of the following:

1. **Plaintiff's Position**

    A. **Apart from Defendant Guevara, the Defendants Have No Interest In Streamlining Summary Judgment Practice.**

At the outset, Defendant Guevara has indicated he will not move for summary judgment. The remaining Defendants insist on wasting the parties and the Courts' resources, pursuing frivolous summary judgment practice.

After more than four years of discovery, Plaintiffs have developed a mountain of evidence demonstrating that the Defendant Officers framed them for a 1994 double murder ("the Cortland murders") they did not commit. Both Plaintiffs received Certificates of Innocence after serving 23 years incarcerated in maximum security facilities. For his part, Defendant Almodovar faced a

1

sentence of death after the Defendent Officers' false accounts set forth in fabricated police reports persuaded prosecutors to seek the death penalty against Almodovar, a 19-year-old with no criminal background.

In keeping with a long and well-established pattern and practice of outrageous misconduct designed to frame poor, Hispanic teenagers for unsolved murders in Humboldt Park, Defendants Olszewski, Halvorsen, and Guevara with the supervision of Sergeant Mingey, agreed to falsely arrest Almodovar for the purpose of obtaining a Poloroid photo of him so that they could use the photo to manipulate false identifications of him from the two Cortland murder victim-witnesses, Kennelly Saez and Jackie Grande. After entering into the agreement, the Defendants worked together to accomplish the plan to frame the Plaintiffs. Defendant Olszewski, who had routinely harassed Plaintiff Almodovar including by threatening to "lock him up for good,"arrested Almodovar inside his cousin's house (an entry that a state court judge later determined was illegal). The arrest was made as a pretext to obtaining two (2) Poloroid photos of him that were promptly handed over to Defendant Halvorsen pursuant to the Defendant Officers' plan. After the photos were taken, Almodovar was released from custody without any charges. Another gang crimes officer provided a Poloroid photo of Plaintiff Negron to Defendant Halvorsen for no other reason than Almodovar and Negron were friends. Defendant Halvorsen then passed the photos off to Guevara who did his magic. Guevara took the photos to the two young, traumatized victims and promised them that the young men in the photos were responsible for the murders of their friends. Guevara immediately brought the young victims to Area Five to view a physical line-up and warned them not to tell anyone that they had seen the photos.

Detectives Halvorsen and Guevara conducted the physical line-up and Saez and Grande did what they thought was right; they identified the two people who Gueavra told them murdered their friends and almost murdered them. The Defendant Officers ignored Almodovar's pleas that he had an alibi for the time of the murders and could not possibly be involved. On the day of the murders, Almodovar had worked a 12-hour shift doing sanitation at Farley Candy Factory before he took the bus to Wright College where he took a G.E.D. class before returning home by bus at 11:00 p.m. The evening was a memorable night because Almodovar and his girlfriend had an extended and heared argument over the fact that she was out with their newborn baby when he arrived home. The couple argued into the wee hours of the morning, long after the shooting occurred. The argument was witnessed or heard by no fewer than *eight* individuals, including a neighbor.

After the Defendant Officers had secured the false identifications, Defendant Olszewski stuck his head into the interrogation room where Almdovoar was detained and gleefully announced, "Got Ya.[1]" Plaintiffs were subsequently indicted for a crime that carried a mandatory sentence of natural life in prison.

The circumstances of the false identification were revealed even before trial when Kennelly Saez disclosed Guevara's misconduct. The prosecutors on the case bribed Saez to testify consistent with his police-influenced statement and identification in exchange for leniency in a criminal case that he was fighting. Saez agreed and was promptly released from custody after testifiying to the

---

[1] Defendant Olszewski denied that he told Almodovar "Got Ya" but admitted that he may have said something like "Told ya so."

fabricated version fed to him by Defendant Guevara. Saez later admitted to Almodovar's post-conviction counsel, Matthew Kennelly, that the identifications were bogus and influenced by Defendant Guevara. For the past 23 years, Saez has consistently testified that Guevara was responsible for inducing the false identifications of the Plaintiff by showing him and Grande the Poloroid photos that Olszewski took and provided to Defendant Halvorsen. Grande has not formally "recanted" but also has no recollection of who is responsible for the shooting and cannot and will not identify Plaintiffs as the offenders.

The Defendants, of course, resist this narrative but have no facts to refute it. Minimally, Defendants know that Plaintiffs' claims must go to a jury. Guevara has invoked his Fifth Amendment rights in this case to each and every question posed to him. And Halvorsen also invoked his Fifth Amendment rights in response to questions about this investigation when asked during an unrelated deposition. Halvorsen has since died and was not deposed in this case before he passed. Defendant Mingey *also* previously invoked his Fifth Amendment rights in connection with his invovlement in this investigation, but answered questions during his deposition in this case. Mingey's prior invocations will be used to impeach him at trial.

Plaintiffs have raised Due Process claims based on the fabricated identification testimony and the concealment of their own and their fellow officers' misconduct as described above. Plaintiffs have also raised a Fouth Amendment prolonged detention and state tort malicious prosecution claim on the grounds that the Defendant officers directly exerted influence in bringing about murder charges for which no probable cause existed other than the tainted identifications that they conspired to obtain and did, in fact, obtain.

The parties met and conferred on the issue of whether summary judgment practice could be streamlined. Respectably, Defendant Guevara will not seek summary judgment. However, Defendants Olszewski, Halvorsen, and Mingey insist that they have cognizable summary judgment arguments to make. Plaintiff Almodovar agrees that Defendant Mingey had a viable summary judgment position to take, but contends that any arguments on behalf of Defendants Olszewski and Halvorsen are frivolous. Indeed, as to Defendant Halvorsen, Plaintiff would have a better change at summary judgment which he may seek to bring in light of the Defendants' unreasonable positions. In short, the parties were unable to reach any agreements that would streamline this process. Clearly, Defendants' counsel has an interest in delaying litigation of this case and driving up of the expenses by advancing frivolous arguments.

Notwithstanding case law to the contrary, Defendants Halvorsen and Olszewski insist that because they did not *personally* interact with Saez and Grande they cannot be held responsible for framing Plaintiffs. They make this claim despite the fact that each of the Defendants took specific actions to manufacture the false evidence that led to Plaintiffs' wrongful convictions. Olszewski contrived a false arrest to obtain Poloroid photos of Almodovar and interrogated him about the murders; Halvorsen retrieved the photos and provided them to Guevara and administed the line-up; Guevara used the photos to influence Saez and Grande to make the false identifications; Mingey oversaw and sanctioned all of it. All three defendants wrote reports that contained false statements approved by Mingey. And each and everyone them concealed their own wrongdoing and the wrongdoing of their co-conspirators. It is undisputed that no evidence supported the

charges aside from the tainted identifications. It is nothing short of frivolous that Defendants Halvorsen and Olszewski are intent on pursuing summary judgment in their favor.

> **B.** *Monell* **Discovery Must Proceed Now While the Parties Engage in Frivolous Summary Judgment Practice.**

This Court previously stayed *Monell* discovery presumably to allow the parties the opportunity to complete discovery related to the individual defendants and to allow Plaintiffs to fine tune their *Monell* theories. Plaintiffs have done just that and are ready to proceed with *Monell* discovery while summary judgment practice proceeds. At the outset, Guevara has already conceded that the case must proceed to trial as to the claims against him. Although Defendants Olszewski and Halvorsen are in deep denial about whether they will be cut loose from this case, the record is clear. They won't.

With this in mind, Plaintiffs should be permitted to develop their viable *Monell* theories: (1) the City of Chicago had a *de facto* practice of conducting highly suggestive identification procedures that included providing information to witnesses that influenced those witnesses to identify targeted individuals from photo arrays and live line-up; (2) the City of Chicago failed to train its Officers on how to conduct constitutionally permissible identification procedures; and (3) the City of Chicago failed to moniter, supervise, and discipline Defendant Guevara who was notorious for rigging photo identification procedures. By 1994, the City of Chicago was well aware that Guevara was a dirty cop who manipulated and fabricated evidence to frame young, Hispanic teenagers in Humboldt Park. The City did nothing to discourage this criminal behavior. They now must be held directly responsible for it.

This case has lingered far too long. Plaintiff should not have to wait to develop *Monell* theories that clearly were the driving force behind the false identifications in this case until after a trial. Indeed, there is no telling when Plaintiff will get a trial date and he should be permitted to conduct *Monell* discovery on these limited and narrow *Monell* theories while the Defendant officers waste the parties and Court's time and resources while engaging in frivolous summary judgment practice.

**2. Defendants' position**

Pursuant to this Court's order of September 15,2022 to meet and confer regarding the possibility of streamlining dispositive motion practice, the parties met telephonically and conferred on September 27, 2022. The parties spent time discussing each defendant and Plaintiffs' claims. Defendants and counsel for Almodovar discussed their respective positions on these issues. Counsel for Guevara indicated that it was unlikely that Defendant Guevara would be seeking summary judgment. Counsel for Almodovar indicated she was willing to streamline and potentially eliminate one defendant, Mingey, for summary judgment but requested additional time to evaluate the legal issues. Additionally, settlement was discussed and counsel for both Plaintiffs indicated they would revise their demands.

On October 3,2022 at 2:56 pm, counsel for Almodovar emailed all parties her updated position on summary judgment. This included a possibility of dropping Mingey as defendant, but no other possible narrowing of issues. Shortly thereafter , Plaintiff Almodovar also sent an updated settlement demand that was an increase from the last demand. Plaintiff Negron needed additional time to give Defendants his position on the summary judgment issues and stated he would be unable to give a revised demand until October 7, 2022.

On 10/4/2022 at 11:53 a.m. Negron indicated that "Plaintiff Negron shares Almodovar's position on SJ." At 2:42 p.m., Defendants responded to Plaintiffs and stated:

> "Thank you for further discussing plaintiffs' positions on summary judgment. It appears plaintiffs are willing to dismiss Defendant Mingey – please confirm.
>
> With respect to Defendants Olszewski and Halvorsen we respectfully disagree with your assessment. The due process claims alleged by plaintiffs protect the right to a fair trial. The underlying criminal trial was an "identification case" based on the testimony of eyewitnesses Grande and Saez. Defendants Olszewski and Halvorsen's position is that because neither of them had contact with either eyewitness, plaintiffs lack an evidentiary basis to support the due process and Manuel claims against them. And if the substantive claims fail, then the derivative claims of conspiracy and failure to intervene also fail.
>
> Defendant Guevara does not intend to move for summary judgment.
>
> Please let us know how you wish to proceed on the joint status report. We believe setting forth the fact of our meet and confer and the results of our discussion on streamlining summary judgment should suffice."

After Defendants' response, Plaintiffs decided that they would not be dropping Mr. Mingey as a Defendant. While it is unfortunate that what was previously an amicable discussion between Defendants and Plaintiff Almodovar has ended with this type of status report, the exercise did focus both sides on the strengths and weaknesses of their cases prior to motion practice.

Additionally, Defendants are not in agreement with Plaintiffs on the issue of *Monell* discovery. This Court's order granting Defendants' motion to bifurcate held: "Thus, in this case, it makes sense to stay *Monell* discovery until discovery on the claims against the individual defendants is completed and any summary judgment motion they may file has been decided." Dkt 73 at p. 2. The individual defendants intend to file summary judgment. Accordingly, pursuant to this Court's prior order, *Monell* discovery remains bifurcated until that summary judgment motion is decided. If Plaintiffs seek to revisit this Court's prior order then Plaintiffs should file a motion.

Dated: October 4, 2022                                         RESPECTFULLY SUBMITTED:

/s/ JENNIFER BONJEAN
/s/ ASHLEY COHEN
*Attorneys for Plaintiff Almodovar*

Jennifer Bonjean
Ashley Cohen
BONJEAN LAW GROUP
750 Lexington Avenue, 9th Floor
New York, NY 10022
(718) 875-1850
Jennifer@Bonjeanlaw.com
Ashley@Bonjeanlaw.com

s/ Joseph Polick
*Attorney for Defendants Olszewski, Halvorsen and Mingey*
Special Assistant Corporation Counsel

James G. Sotos
Josh M. Engquist
Jeffrey R. Kivetz
David A. Brueggen
Daniel McGinnis
The Sotos Law Firm, P.C.
141 W. Jackson Blvd., Ste 1240A Chicago,, Illinois 60604
(630) 735-3300
jpolick@sotoslaw.com

/s/ LINDSAY HAGY
*Attorney for Plaintiff William Negron*
Loevy & Loevy
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
312-243-5900
312-357-5437
Lindsay@loevy.com

/s/ Megan McGrath
*Special Assistant Corporation Counsel Counsel for Defendant Guevara*
Thomas M. Leinenweber
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(312) 663-3003
thomas@ilesq.com

By: /s/ *Eileen Rosen*
Special Assistant Corporation Counsel for the City of Chicago

Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly, LLC
333 West Wacker, 19th Floor

Chicago, Illinois 60606

6

(312) 494-1000
erosen@rfclaw.com