*Almodovar v. Guevara, et al.*
Case No. 18 CV 2341

*Negron v. Guevara, et al.*
Case No. 18 CV 2701

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERTO ALMODOVAR, JR. | ) | |
| | ) | Case No. 18 CV 2341 |
| Plaintiff, | ) | |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | JURY DEMAND |
| REYNALDO GUEVARA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS HALVORSEN, MINGEY AND OLSZEWSKI'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Defendants Ernest Halvorsen, Edward Mingey, and Mark Olszewski (collectively "Answering Defendants'), by their attorneys, The Sotos Law Firm, P.C., answer Plaintiff's Complaint as follows:

## INTRODUCTION

1.      Plaintiff, Roberto Almodovar, Jr., spent 23 years incarcerated in the Illinois Department of Corrections for the murders of Amy Merkes, Jorge Rodriguez, and the attempted murders of Kennelly Saez and Jacqueline Grande – crimes he did not commit.

**ANSWER:**      Answering Defendants admit, on information and belief, that Plaintiff was incarcerated in the Illinois Department of Corrections regarding the murders of Amy Merkes, Jorge Rodriguez and the attempted murders of Kennelly Saez and Jacquiline Grande.  Answering Defendants lack knowledge or information sufficient to admit or deny the amount of time Plaintiff was incarcerated.  Answering Defendants, on information and belief, deny the remaining allegations in this paragraph.

2.      In and around September 4, 1994, the Police Officer Defendants – Reynaldo GUEVARA, Ernest HALVORSEN, Mark OLSZEWSKI and Edward MINGEY – conspired among themselves and with others, known and unknown, to prosecute Plaintiff for the murders of Merkes

1

and Rodriguez and attempted murders of Grande and Saez while indifferent to the fact that he was innocent.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph.

3.    All of the defendant officers concealed the fact that they had conspired to and did frame Plaintiff for the murders by knowingly inducing false identification testimony from the young and traumatized victims of the crime through manipulation, trickery, suggestion, pressure, coercion, and other unlawful tactics.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph.

4.    No physical evidence connected Plaintiff to the crime and the defendant officers knowingly ignored Plaintiff's alibi that was verifiable through no fewer than seven witnesses. Without the Defendants' concealment of evidence, falsification of evidence, and manipulation of witness testimony, Plaintiff would never have been convicted.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny the allegations regarding the allegations of physical evidence connecting Plaintiff to the crime. Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, and lack knowledge as to the remaining allegations in this paragraph.

5.    For over two decades, Plaintiff fought to prove his innocence while the defendant officers continued to frame Latino men in the Humboldt Park area of Chicago until retiring with their full police pension.

**ANSWER:**    Answering Defendants admit they are retired with police pensions. Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, and lack knowledge as to the remaining allegations in this paragraph.

6.    Finally, on April 14, 2017 (after an evidentiary hearing that lasted over two years) the office of the Cook County State's Attorney vacated Plaintiff's convictions and moved for an order to *nolle prosequi* the charges. That day, Plaintiff was released from custody. With no

objection from the State, the Honorable Chief Judge of the Criminal Division, Leroy Martin, Jr.,

granted Plaintiff a Certificate of Innocence on November 20, 2017.

**ANSWER:** Answering Defendants admit, on information and belief, that on April 14, 2017 the underlying criminal matter was dismissed. Answering Defendants further admit, on information and belief, that on November 20, 2017, Judge Leroy Martin, Jr. granted plaintiffs petition for a certificate of innocence and the Cook County State's Attorney's Office did not raise an objection to the petition. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

7.     Even before Plaintiff's formal exoneration, the City of Chicago retained former

United States Attorney Scott Lassar and his firm Sidley & Austin to conduct an independent

investigation into GUEVARA's conduct in a number of GUEVARA-related murder investigations,

including Plaintiff's. The City, through their attorneys, concluded that Plaintiff was probably

innocent of the murders of Merkes and Rodriguez and attempted murders of Grande and Saez.

**ANSWER:** Answering Defendants, on information and belief, admit the City of Chicago retained former United States Attorney Scott Lassar and his firm Sidley & Austin to conduct an independent review of a number of Guevara-related murder investigations, including Plaintiff's. Answering Defendants, upon information and belief, deny the remaining allegations in this paragraph.

8.     Sadly, Plaintiff is among a growing group of Latino men from Humboldt Park who

have proven that they were framed for crimes they did not commit at the hands of the defendant

officers. Just by way of example, defendants GUEVARA, HALVORSEN, and MINGEY framed

Armando Serrano and Jose Montanez for the 1993 murder of Rodrigo Vargas. Serrano and

Montanez were exonerated on July 20, 2016, following the Illinois Appellate Court's issuance of a

pair of scathing decisions acknowledging GUEVARA's pattern and practice of misconduct. *People*

*v. Serrano*, 2016 IL App (1st) 133493 (June 7, 2016) and *People v. Montanez,* 2016 IL App (1st)

133726 (June 7, 2016). Serrano and Montanez received Certificates of Innocence on November 2,

2016 and both filed federal civil rights actions that are currently pending in this Court. *See Serrano*

*v. Guevara*, *et al.*, 17-cv-2869 and *Montanez v. Guevara, et al.* 17-cv-4560.

**ANSWER:**     Answering Defendants deny the allegations as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

9.     Defendants GUEVARA and MINGEY also framed Jacques Rivera who was

wrongfully convicted of the 1988 murder of Felix Valentin. The Cook County State's Attorney's

office vacated Rivera's conviction on October 4, 2011, and he received a Certificate of Innocence

on September 5, 2012. Rivera's civil suit against GUEVARA and MINGEY is currently pending in

this Court. *Rivera v. Guevara, et al.,* 12-cv-4428.

**ANSWER:**     Answering Defendants admit, on information and belief, that Rivera's conviction was vacated on or about October 4, 2011 and he later received a certificate of Innocence on or around September 5, 2012.  Answering Defendants deny the allegations as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

10.     Since Plaintiff's exoneration less than a year ago, the State has vacated murder

convictions of six other individuals who have demonstrated that they were framed by GUEVARA,

HALVORSEN and MINGEY including Jose Maysonet, Arturo Reyes, Gabriel Solache, Thomas

Sierra, Ariel Gomez, and Ricardo Rodriguez.

**ANSWER:**     Answering Defendants deny the allegations as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

11.     Plaintiff now seeks compensation for the incalculable hardship and injury he

suffered as a result of the Defendants' egregious misconduct.

**ANSWER:**     Answering Defendants admit that Plaintiff and his attorneys are seeking monetary compensation from the Defendants for alleged injuries.  Answering Defendants deny the remaining allegations as they pertain to them and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under

color of state law of Plaintiff's rights as secured by the United States Constitution as well as the

deprivation of rights under Illinois state law.

**ANSWER:**     Answering Defendants admit that Plaintiff has brought this lawsuit pursuant to 42
U.S.C. §1983 and Illinois Law and makes allegations of tortious conduct and
deprivation of his constitutional rights.  Answering Defendants deny the remaining
allegations in this paragraph as they pertain to them.  Answering Defendants lack
knowledge or information sufficient to admit or deny the remaining allegations in
this paragraph.

13.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper

under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving

rise to the claims asserted herein occurred in this judicial district.

**ANSWER:**     Answering Defendants admit this Court has jurisdiction of Plaintiff's federal claims
pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims
pursuant to 28 U.S.C. § 1367.  Answering Defendants admit venue is proper under
28 U.S.C. § 1391(b).  Answering Defendants admit, on information and belief, that
Defendants reside in this judicial district.  Answering Defendants lack knowledge or
information sufficient to admit or deny the allegation regarding where Plaintiff
resides.

## PARTIES

14.     Plaintiff Roberto Almodovar, Jr., a 44-year-old Latino man, is a citizen of the United

States and resides in the City of Chicago.

**ANSWER:**     Answering Defendants admit, on information and belief, that Plaintiff is a Latino
man.  Answering Defendants lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.

15.     Defendant CITY OF CHICAGO is an Illinois Municipal Corporation, which

employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

**ANSWER:**     Answering Defendants admit the allegations in this paragraph.

16.     At all relevant times hereto, Defendants Reynaldo GUEVARA (Star No. 16345) and Ernest HALVORSEN (Star No. 20692) were members of the Chicago Police Department and assigned to Area Five's Violent Crimes Unit. Defendant OLSZEWSKI (Star No. 4337) was a member of the 25th District gang team. Each of these defendants conspired with one another and with other persons, known and unknown, to conceal and fabricate evidence, manipulate witness testimony, and maliciously prosecute Plaintiff for the murders of Jorge Rodriguez and Amy Merkes.

**ANSWER:**     Answering Defendants admit that Defendants Guevara and Halvorsen were, at all relevant times to Plaintiff's complaint, members of the Chicago Police Department assigned to Area Five Detective Division in the violent crimes unit. Answering Defendants further admit that Defendant Olszewski was, at all relevant times to Plaintiff's complaint, assigned to the 25th District Tactical Team. Answering Defendants deny the remaining allegations in this paragraph.

17.     Defendant Sergeant Edward MINGEY (Star No. 1731) was a member of the Chicago Police Department and assigned to Area Five's Violent Crimes Unit. MINGEY was, at all relevant times, a supervisor of the Police Officer Defendants. He facilitated, condoned and approved the constitutional violations committed by the Police Officer Defendants.

**ANSWER:**     Answering Defendants admit that Defendant Mingey was, at all relevant times to Plaintiff's complaint, a member of the Chicago Police Department assigned to Area Five Detective Division as a supervisor. Answering Defendants admit that at certain times he would have been the supervisor for Defendants Halvorsen and Guevara. Answering Defendants deny the remaining allegations in this paragraph.

18.     Each of the individual Chicago Police officer defendants are sued in his individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this Complaint.

**ANSWER:**     Answering Defendants admit, at all relevant times to Plaintiff's complaint, they were acting under color of state law and were in the scope of their employment. Answering Defendants further admit that Plaintiff is suing them in their individual capacities. Answering Defendants deny the remaining allegations in this paragraph.

## FACTUAL ALLEGATIONS
### *"Take your spic-ass back to Humboldt Park"* – Defendant Mark Olszewski

19.     In 1993, Plaintiff lived with his aunt and uncle in the predominantly Hispanic neighborhood known as Humboldt Park. Although he affiliated with the Insane Dragons, a street gang that many of his family members belonged to, Plaintiff largely steered clear of gang-related activities.

**ANSWER:**     Answering Defendants admit that Plaintiff was a member of the Insane Dragons street gang.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

20.     Plaintiff's efforts to stay on a straight and narrow path did not stop defendant OLSZEWSKI from targeting him for baseless arrests. Plaintiff turned 18 years old on April 27, 1993. Around that time, he began suffering regular harassment and racially-motivated verbal abuse from defendant OLSZEWSKI. Defendant OLSZEWSKI was a 25th District gang crimes officer who despised the Humboldt Park community, viewed all Hispanics as fungible gangbangers, and approached policing the Humboldt Park community as if he was hunting big game. Defendant OLSZEWSKI was known to confiscate personal items (such as articles of clothing) from "gang-bangers" he arrested that he proudly displayed in his 25th District office like trophies.

**ANSWER:**     Answering Defendants admit that Olszewski was assigned to the 25th district tactical team at all relevant times to Plaintiff's complaint and deny that Olszewski was assigned to gang crimes at all relevant times to Plaintiff's complaint.  Defendant Olszewski admits that the tactical office did have some recovered gang paraphernalia displayed.  Defendant Olszewski denies the remaining allegations related to him, and lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.  Defendants Mingey and Halvorsen deny the remaining allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

21.     Defendant OLSZEWSKI had a particular disdain for Plaintiff and his family, because some members of the Almodovar family lived in a neighborhood (near Normandy and

Belden) adjacent to Humboldt Park that was comprised largely of white people. Defendant Plaintiff

would often visit his cousin and girlfriend who both lived in the area of Normandy and Belden.

Whenever OLSZEWSKI saw Plaintiff and his cousins in the neighborhood he would stop and

harass them.

**ANSWER:**     Defendant Olszewski denies the allegations in this paragraph as they pertain to him, but lacks knowledge or information sufficient to admit or deny the remaining allegations.  Defendants Mingey and Halvorsen lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

22.     For example, in and around spring 1993, Plaintiff was walking toward his cousin's

house located near Belden and Rutherford Avenues. As Plaintiff walked down the street,

OLSZEWSKI pulled up next to Plaintiff in his marked police car. OLSZEWSKI stated in sum and

substance, "[t]ake your spic-ass back to Humboldt Park, you don't belong over here. You aren't

fucking up my neighborhood."

**ANSWER:**     Defendant Olszewski denies the allegations of misconduct and statement alleged in this paragraph, but lacks knowledge or information sufficient to admit or deny the remaining allegations.  Defendants Mingey and Halvorsen lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

23.     On another occasion in August 1993, Plaintiff was hanging out at a McDonalds on

North avenue with some friends and his girlfriend, Azalia Carrillo ("Sassy"). Defendant

OLSZEWSKI entered the restaurant and ordered Plaintiff into the bathroom with him. Plaintiff

complied. Once in the bathroom, OLSZEWSKI began questioning Plaintiff about an incident

involving vandalism to a car. Plaintiff had no knowledge about the incident and told OLSZEWSKI

as much. OLSZEWSKI smacked Plaintiff around, called him a liar, and then arrested him. The

charges were later dismissed.

**ANSWER:**     Defendant Olszewski denies the allegations of misconduct alleged in this paragraph, but lacks knowledge or information sufficient to admit or deny the remaining allegations.  Defendants Mingey and Halvorsen lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

24.     That same summer OLSZEWSKI cornered Plaintiff in an alley in the Brickyard (a neighborhood near Grand and Oak Park Avenues) and said to him, in sum and substance, "I've been locking up your buddies. You think you're slick. But you aren't that slick. And when I do get you, you are going away for a long time."

**ANSWER:**     Defendant Olszewski denies the allegations of misconduct and the statement alleged in this paragraph, but lacks knowledge or information sufficient to admit or deny the remaining allegations. Defendants Mingey and Halvorsen lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

25.     In and around March 1994, Plaintiff dissociated himself entirely from all gang activity upon learning that his girlfriend Sassy was pregnant with their daughter. Plaintiff began attending school and working full-time doing janitorial work at Farley's Chocolate Company.

**ANSWER:**     Answering Defendants deny, on information and belief, that Plaintiff had dissociated himself entirely from all gang activity. Answering Defendants lack knowledge or information to admit or deny the remaining allegations in this paragraph.

26.     Between April 1993 and August 1994, Plaintiff was arrested for petty offenses like "mob action" and "gang loitering" roughly six (6) times. All cases were dismissed. Indeed, prior to the arrest that resulted in Plaintiff's 23-year wrongful conviction, he had no prior convictions.

**ANSWER:**     Answering Defendants admit, on information and belief, that that Plaintiff was arrested between April 1993 and August 1994, but lack knowledge or information to admit or deny the remaining allegations in this paragraph.

**The Alibi**

27.     On August 31, 1994, Plaintiff worked an eleven-hour shift at Farley's Chocolate Company. He left work at roughly 5:00 p.m. and took a bus to Wilbur Wright College where he attended GED classes. Sometime between 9:30 and 10:00 p.m., he took a City bus back to his home at 1732 North Springfield Ave., arriving home at approximately 10:45 p.m.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

9

28.     At the time, Plaintiff lived at the Springfield address with his aunt Mary Rodriguez, his uncle Jose ("Joe") Rodriguez, his 10-year old cousin, Joe Jr., his grandmother, his uncle Edwin, and his girlfriend Sassy who had given birth to their daughter Jasmine six-months earlier.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

29.      When Plaintiff arrived home at roughly 10:45 p.m., he was angry because Sassy and the baby were not home. Sassy arrived home with the baby at roughly 11:00 p.m. and the two started arguing about Sassy having the baby out so late.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

30.     Plaintiff's aunt Mary was upset with the young couple, because their arguing was disrupting other members of the household, including Joe Jr., whose first day of school was the following day, September 1, 1994. Indeed, the next-door neighbor was awakened by the loud argument.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

31.     Mary called her nephew Sergio Almodovar and his wife Amaris Carrillo, Sassy's sister, and asked them to come to the house to help mediate the argument between Plaintiff and Sassy. Sergio and Amaris agreed.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

32.     Sergio and Amaris spent an hour or two at the house helping ease the tensions between Plaintiff and Sassy and left the house at around 1:30 a.m. Plaintiff did not leave the Springfield residence between the time he arrived home at around 10:45 p.m. and the next morning.

**ANSWER:** Answering Defendants, on information and belief, deny the allegations in this paragraph.

### The Shooting

33.     While Plaintiff and Sassy argued at the Springfield residence, and Sergio and Amaris attempted to mediate, a separate group of young people gathered on a stoop in front of an apartment building located at 3920 W. Cortland St.

**ANSWER:** Answering Defendants admit, on information and belief, that there were four soon to be crime victims outside front door of the apartment building located at 3920 W. Cortland St. at 00:45 hours on September 1, 1994. Answering Defendants, on information and belief, deny the remaining allegations in this paragraph.

34.     Among the group was Jacqueline Grande ("Grande"), Amy Merkes ("Merkes"), Jorge Rodriguez ("Rodriguez"), and Kennelly Saez ("Saez"). Rodriguez and Saez were longtime friends, Saez and Merkes were dating, and Grande described Merkes as her "best friend."

**ANSWER:** Answering Defendants, on information and belief, admit the allegation in this paragraph.

35.     Saez lived on the building's third floor; the building bordered the sidewalk for nearly a half-block, and a single lightbulb over the door illuminated the area. The nearest streetlight was a quarter block away on the opposite side of the tree-lined street.

**ANSWER:** Answering Defendants admit, on information and belief, that Saez lived on the building's third floor and the building bordered a sidewalk. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

36.     Saez and Rodriguez were members of the Maniac Latin Disciplines street gang. In September 1994, the Disciples were purportedly in conflict with the Latin Kings, the Unknowns, and the Insane Dragons, but Saez lived on a neutral corner.

**ANSWER:** Answering Defendants admit, on information and belief, that Saez was a member of the Maniac Latin Disciplines street gang at the time of the underlying incident. Answering Defendants admit, on information and belief, that at the time of the underlying incident, the Maniac Latin Disciples were in a gang war with the Insane

Dragons.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

37.    At approximately 12:45 a.m., Saez was standing and speaking to his friends who remained sitting on a step adjacent to the sidewalk. A parkway separated the sidewalk from the street where cars were parked. A blue Oldsmobile drove down the street.

**ANSWER:**    Answering Defendants admit, on information and belief, that at approximately 12:45 a.m. Saez, Rodriguez, Grande, and Merkes were at the area in front of the building near the front door.  Answering Defendants further admit, on information and belief, that the parkway separated the sidewalk from the street where cars were parked and that shortly before 12:45 a.m. a blue Oldsmobile drove down the street.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

38.    The blue Oldsmobile containing three individuals passed them again, but this time it pulled into the alley that abutted the building. The car drove in reverse out of the alley, on to the street, and stopped in a space between two cars parked in front of the group. Saez approached the car and got as far as the sidewalk when the rear passenger said, "What's up, folks?" Saez replied, "who's that," and the rear passenger drew a handgun and began firing.

**ANSWER:**    Answering Defendants deny, on information and belief, the chronology alleged as to the interactions between the vicitms and the offenders as alleged in this paragraph. Answering Defendants, on information and belief, admit the remaining allegations in this paragraph.

39.    When the firing began, Saez dove behind a parked car, and Grande, Merkes, and Rodriguez fled into the building's foyer, through an interior door and up a staircase. Grande, Merkes, and Rodriguez were shot as they ascended the staircase. Grande was shot in the back but kept fleeing up the stairs. Merkes collapsed and died in the stairwell. Rodriguez ran to Saez's third floor apartment and collapsed there. Grande took refuge in another third-floor apartment.

**ANSWER:**    Answering Defendants, on information and belief, admit Saez dove behind or near a parked car, and Grande, Merkes, and Rodriguez fled into the building's foyer and attempted to flee up a staircase. Answering Defendants further admit, on information and belief, that Grande, Merkes, and Rodriguez were shot as they attempted to

ascend the staircase.  Answering Defendants further admit, on information and belief, that Grande was shot in the back of her shoulder, but was able to flee up the stairs, that Merkes collapsed and died in the stairwell, and Rodriguez ran to Saez's third floor apartment and collapsed there.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

40.     The blue car sped away, and Saez ran to his third-floor apartment and called 911. Rodriguez was transported to a hospital and died soon thereafter. Grande was hospitalized for a gunshot wound to her back and shoulder.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations as the actions of Saez immediately after the shooting.  Answering Defendants, on information and belief, admit the remaining allegations in this paragraph.

41.     Chicago police officer Robert Lohman was on routine patrol when an off-duty deputy sheriff who lived in the area informed him that a drive-by shooting had occurred at the intersection of Cortland street and Harding avenue. Officer Lohman spoke to an injured Grande on-scene who described the perpetrators as three Hispanics, sixteen to twenty years old, wearing Starter jackets. She was unable to provide any description of weights, heights, or hair styles.

**ANSWER:**     Answering Defendants admit, on information and belief, that Officer Lohman was on patrol when he was flagged down by an off-duty deputy sheriff who informed him of the drive-by shooting that had just occurred.  Answering Defendants further admit, on information and belief, that Officer Lohman observed and injured Grande on-scene and further admit that the initial description of  the offenders that Officers Lohman and Obrecki received included three Hispanics, sixteen to twenty years old, wearing Starter jackets.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

42.     Later in the day on September 1, 1994, Grande spoke to detective Dembowksi at the hospital who memorialized her statements in a police report. Grande told Dembowksi that the assailants were "three male Hispanics; the driver was tall and thin, dark hair, light complexion. The front passenger had a thin long face with a light complexion, black jacket, red hat. The backseat passenger was skinny, dark hair, medium complexion, clean looking, all teens and early twenties."

13

**ANSWER:**   Answering Defendants admit, on information and belief, that on September 1, 1994, Grande did speak with Det. Dembowski while at the hospital and that this interview was documented in a police report.  Answering Defendants deny, on information and belief, that the description was verbatim as it is alleged in this paragraph.

43.   Saez was interviewed at the police station after the shooting and could only describe the offenders as three male Latinos in a blue car. Saez told the police he dove behind a car when the shooting started and did not see the offenders.

**ANSWER:**   Answering Defendants admit, on information and belief, that Saez was interviewed at the Area Five after the shooting and that Saez stated that he ducked down behind a car.  Answering Defendants deny, on information and belief, the remaining allegations in this paragraph.

44.   After a few days went by with no solid leads or arrests, defendants GUEVARA and HALVORSEN were assigned to the case. Sergeant MINGEY routinely assigned GUEVARA and HALVORSEN to murder cases that he wanted closed quickly.

**ANSWER:**   Defendants Halvorsen and Mingey deny the allegations in this paragraph. Defendant Olszewski lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.

### The Frame-Up

45.   As they had done numerous times in the past, defendants GUEVARA, HALVORSEN and MINGEY began strategizing about who they wanted to frame for the murders of Merkes and Rodriguez. Consistent with their custom, the defendant officers saw no reason to waste time legitimately investigating the case and attempting to identify the true offenders. Their perspective was that all the "gang bangers" in Humboldt Park were the same and would eventually get what was owed to them, either death or murder charges.

**ANSWER:**   Defendants Halvorsen and Mingey deny the allegations in this paragraph.  Defendant Olszewski denies the allegations as they pertain to him, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

14

46.     GUEVARA, HALVORSEN and MINGEY theorized that the Maniac Latin Disciplines (the victims' gang) and the Insane Dragons were at war with one another and that the shooting on Cortland was in retaliation for the murder of an Insane Dragon that recently took place seven blocks away. Thus, it made sense to pin the Cortland murders on Insane Dragons.

**ANSWER:**     Defendant Halvorsen admits that he knew that the Maniac Latin Disciplines (the victims' gang) and the Insane Dragons were at war with one another and that the shooting on Cortland could have been in retaliation for the murder of an Insane Dragon gang member that recently took place seven blocks away when he began investigating this matter. Defendant Halvorsen denies the remaining allegations in this paragraph. Defendants Mingey and Olszewski deny the allegations as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

47.     GUEVARA, HALVORSEN, and MINGEY turned to their colleague defendant OLSZEWSKI for input on who to "hook up" with this case, since OLSZEWSKI was most familiar with the members of the Insane Dragons gang. Defendant OLSZEWSKI suggested the perfect candidate – Plaintiff.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph.

48.     Defendants GUEVARA and HALVORSEN asked OLSZEWSKI to obtain a photo of Plaintiff so that they could use it to secure a false identification of Plaintiff as one of the offenders. But OLSZEWSKI had no photo of Plaintiff.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph.

49.     With this in mind, the defendants derived a plan to arrest Plaintiff and obtain a photo of him that would later be used to frame him for the double murder. Defendant OLSZEWSKI went to Plaintiff's cousins house located on Rutherford avenue on the evening of September 4, 1994.

**ANSWER:**     Answering Defendants admit that Olszewski was at a building located on Rutherford on September 4, 1994 in the evening. Defendant Olszewski denies the remaining allegations in this paragraph. Defendants Mingey and Halvorsen deny the remaining allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

50. That evening, Plaintiff was helping his uncle and cousins move out of their home on Rutherford avenue. While taking a break in the living room, they noticed a flashlight out in the yard. Sergio went outside to see what was going on and reported that defendant OLSZEWSKI was outside with his partner. OLSZEWSKI claimed that a "gang" meeting was taking place inside which authorized the officers to search the house.

**ANSWER:** Defendants Halvorsen and Mingey deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations. Defendant Olszewski denies the allegations in this paragraph regarding persons moving out of the building, but lacks knowledge or information sufficient to admit or deny the remaining allegations.

51. OLSZEWSKI ordered Plaintiff (and his family members) on the floor while he and his partner searched the home. OLSZEWSKI returned with a mysterious duffel bag that allegedly contained a sawed-off shotgun. OLSZEWSKI took Sergio into a bedroom of the house and began questioning him about whether he had any knowledge about the shooting on Cortland. Sergio told OLSZEWSKI he knew nothing about it; OLSZEWSKI called Sergio a liar and began striking him and demanding information.

**ANSWER:** Defendants Mingey and Halvorsen deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations. Defendant Olszewski denies the allegations in this paragraph regarding the number of police officers present and the allegations of misconduct, but lacks knowledge or information sufficient to admit or deny the remaining allegations.

52. OLSZEWSKI specifically wanted Sergio to ask Plaintiff whether he had any knowledge about the murders. Sergio left the bedroom and asked Plaintiff (who was still detained in the living room) whether he knew anything about the shooting on Cortland so that he could tell OLSZEWSKI something. Plaintiff told Sergio he had no knowledge about the shooting.

**ANSWER:**     Defendants Mingey and Halvorsen deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.  Defendant Olszewski denies the allegations in this paragraph.

53.     OLSZEWSKI had no reason to believe that either Plaintiff or Sergio had knowledge about the Cortland shooting but he was attempting to get Plaintiff to admit some knowledge about the shooting to his cousin in an effort to start building probable cause against Plaintiff for the murders. Despite OLSZEWSKI'S physical assault of Sergio, Sergio was unable to provide any information about the shooting.

**ANSWER:**     Defendants Mingey and Halvorsen deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.  Defendant Olszewski denies the allegations in this paragraph.

54.     Eventually Plaintiff and his cousins were arrested. Plaintiff was charged with simple "mob action" but the true purpose of Plaintiff's arrest was to obtain a Poloroid photo of him so he could be framed by the defendant officers for the murders on Cortland avenue. Despite having been arrested for mob action and brought to the 25th District on a number of prior occasions, Plaintiff had never had his Poloroid taken. This time was different. OLSZEWSKI took a Poloroid photo of Plaintiff himself.

**ANSWER:**     Answering Defendants admit, on information and belief, that Plaintiff and two other individuals were arrested and charged with mob action and Polaroid photos were taken.  Answering Defendants deny the allegations in this paragraph of misconduct as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

55.     OLSZEWSKI promptly provided the Poloroid photo of Plaintiff to defendants GUEVARA and HALVORSEN with the understanding, knowledge, and intent that the photo would be used to frame Plaintiff for the murders of Merkes and Rodriguez. Defendants GUEVARA and HALVORSEN asked OLSZEWSKI to provide them with a photo of another known Insane

Dragon, named Willie Negron who was one of Plaintiff's friends. Negron also happened to be the

son of GUEVARA'S wife's best friend.

**ANSWER:** Defendant Mingey admits, on information and belief, that Olszewski provided
Halvorsen and Guevara with three Polaroid photos of the arrestees from September
4, 1994. Defendant Mingey denies the remaining allegations in this paragraph as
they pertain to him and denies, upon information and belief, that Olszewski provided
a photograph of Negron, and lack knowledge or information sufficient to admit or
deny the remaining allegations. Defendants Olszewski and Halvorsen admit that
Olszewski provided Halvorsen and Guevara with three Polaroid photos of the
arrestees from September 4, 1994. Defendants Olszewski and Halvorsen deny the
remaining allegations in this paragraph as they pertain to them and that Olszewski
provided a photograph of Negron, but lack knowledge or information sufficient to
admit or deny the remaining allegations.

56. Defendants OLSZEWSKI, GUEVARA, and HALVORSEN discussed that one of

the victims Jackie Grande was young and vulnerable and could be easily manipulated into

identifying Plaintiff and Negron as the offenders. They also discussed that Saez was a rival gang

member who could easily be leaned on to make a false identification of Plaintiff and Negron.

**ANSWER:** Defendants Halvorsen and Olszewski deny the allegations in this paragraph.
Defendant Halvorsen lacks knowledge or information sufficient to admit or deny the
allegations in this paragraph.

57. Defendants GUEVARA and HALVORSEN brought the photos to Grande while she

was still at the hospital convalescing and falsely told her that Plaintiff and Negron were the

offenders who shot her and murdered her friends. GUEVARA and HALVORSEN told Grande that

when she was released from the hospital she would have to identify them in a live line-up.

**ANSWER:** Defendant Halvorsen denies the allegations in this paragraph. Defendants Mingey
and Olszewski, on information and belief, deny the allegations in this paragraph.

58. On September 11, 1994, defendants GUEVARA and HALVORSEN with the

approval of their sergeant defendant MINGEY arrested Plaintiff and brought him into Area Five to

be interviewed. According to defendant HALVORSEN, Plaintiff admitted that he was a current

member of the Insane Dragons street gang and acknowledged that the Insane Dragons and the

Maniac Latin Disciples were at war with one another. Those statements were false. HALVORSEN

also falsely reported that Plaintiff told him that he had been told by Willie Negron at a gang

meeting that the "war" had been called off.

**ANSWER:**   Defendants Mingey admits, upon information and belief, that Defendants Guevara
and Halvorsen arrested Plaintiff and transported them to Area Five, but denies any
allegations of misconduct in this paragraph directed against him.  Defendant
Olszewski denies the allegations in this paragraph as they pertain to them, but lacks
knowledge or information sufficient to admit or deny the remaining allegations.
Defendant Halvorsen denies that there was pre-approval by Mingey before taking
Plaintiff into custody and deny the allegations of misconduct in this paragraph.
Defendant Halvorsen admits the remaining allegations in this paragraph.

59.    Defendants GUEVARA and HALVORSEN then arrested Negron and brought him

to Area Five, again with the approval of defendant MINGEY. Indeed, defendant MINGEY was the

supervising sergeant for the arrests of both Plaintiff and Negron.

**ANSWER:**   Defendants Mingey admits, upon information and belief, that Defendants Guevara
and Halvorsen arrested Negron and transported them to Area Five, but denies any
allegations of misconduct in this paragraph directed against him.  Defendant
Olszewski denies the allegations in this paragraph as they pertain to them, but lacks
knowledge or information sufficient to admit or deny the remaining allegations.
Defendant Halvorsen denies that there was pre-approval by Mingey before taking
Plaintiff into custody and deny the allegations of misconduct in this paragraph.
Defendant Halvorsen admits the remaining allegations in this paragraph.

60.    On September 12, 1994, defendant GUEVARA went to Grande's house to pick her

up to view a live line-up. With the knowledge and approval of HALVORSEN and MINGEY,

GUEVARA again showed Grande the same photos of Plaintiff and Negron they had previously

showed her at the hospital. GUEVARA falsely told Grande that Plaintiff was the shooter in the rear

seat of the car and that Negron was driving the car and was also a shooter. GUEVARA also told

Grande that they would have to get Saez to make the same identifications.

**ANSWER:**   Defendant Olszewski lacks knowledge or information sufficient to admit or deny the
allegations in this paragraph.  Defendant Mingey denies the allegations in this
paragraph as they pertain to him, but lack knowledge or information sufficient to
admit or deny the remaining allegations.  Defendant Halvorsen admits, on

information and belief, that on September 12, 1994, Guevara did transport Grande to the Area to view line-ups. Defendant Halvorsen denies the remaining allegations in this paragraph as they pertain to him, but lacks knowledge or information sufficient to admit or deny the remaining allegations.

61.     GUEVARA and Grande drove to Saez's house. GUEVARA showed Saez the photos of Plaintiff and Negron and falsely told him that they were the offenders. Saez was reluctant to agree because he had not actually seen the shooters, but Grande assured him that GUEVARA was positive that they were the offenders. Saez was overwrought with guilt that his gang involvement had caused the death of his girlfriend and best friend and felt enormous pressure to go along with the program. GUEVARA reassured him that Plaintiff and Negron were the offenders and that he should identify them. Saez knew that he possessed no independent knowledge that Plaintiff and Negron were the offenders but ultimately did what GUEVARA told him to do.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

62.     GUEVARA took Saez and Grande to Area Five to view a line-up. GUEVARA told Saez not to mention that he had been shown photographs of Plaintiff and Negron prior to viewing the line-up.

**ANSWER:**     Defendant Olszewski lacks knowledge or information sufficient to admit or deny the allegations in this paragraph. Defendant Mingey lacks knowledge or information sufficient to admit or deny the allegations in this paragraph. Defendant Halvorsen admits, on information and belief, that Guevara provided transport to the area for Saez, and denies the remaining allegations in this paragraph.

63.     Defendants GUEVARA, HALVORSEN and MINGEY conducted a live line-up at roughly 6:00 p.m. on September 12, 1994. The defendant officers knew that no probable cause existed to justify the arrests of Plaintiff and Negron but nonetheless had Grande and Saez view a line-up knowing that their unlawful tactics would produce a false identification of Plaintiff and Negron. Unsurprisingly, Grande and Saez identified Plaintiff and Negron as the offenders based on

the false statements of GUEVARA and HALVORSEN and the photos of Plaintiff and Negron

previously shown to them.

**ANSWER:**    Defendant Olszewski lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.  Defendant Mingey denies the allegations in this paragraph as they pertain to him, but lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.  Defendant Halvorsen admits that on September 12, 1994 at approximately 6:00 p.m. both Grande and Saez identified Plaintiff and Negron as the offenders, and denies the remaining allegations in this paragraph.

       64.    After being falsely identified and then confined to a holding cell, defendant

OLSZEWSKI popped his head in, looked directly at Plaintiff in the eyes, and said, "Gotcha!"

before walking away laughing.

**ANSWER:**    Defendant Mingey denies, on information and belief, the allegations in this paragraph regarding a false identification, but lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.  Defendant Olszewski lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.  Defendant Halvorsen denies, on information and belief, the allegations in this paragraph regarding a false identification, but lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

### Plaintiff's Wrongful Conviction

       65.    At Plaintiff's trial GUEVARA falsely testified that after the shooting, Saez told him

that the rear passenger-seat occupant of the car [the shooter] had a rectangular head and long hair.

GUEVARA falsely testified that based on Saez's description and his belief that the murder was in

retaliation for the prior murder of an Insane Dragon, GUEVARA obtained a photograph of Plaintiff

and his "associate" Willie Negron.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

       66.     GUEVARA falsely testified that during a telephone interview with Grande on

September 5, 1994, Grande described the car's rear passenger exactly as Saez had a few days

earlier, that is, he had a rectangular head and long hair. GUEVARA's testimony concerning prior descriptions of the offenders by Grande and Saez were entirely fabricated.

**ANSWER:**     Defendants Mingey and Olszewski lack knowledge or information sufficient to admit or deny the allegations in this paragraph. Defendant Halvorsen, on information and belief, denies the allegations in this paragraph as it pertains to Grande, but lacks knowledge or information sufficient to admit or deny the remaining allegations.

      67.     GUEVARA falsely testified that he showed Grande two different photo arrays, one depicting individuals with long hair like Plaintiff and another depicting individuals with short hair like Negron and that she identified Plaintiff and Negron respectively from the two photo arrays. This testimony was wholly fabricated. GUEVARA *never* showed Grande photo arrays and GRANDE never identified Plaintiff or Negron from those alleged photo arrays.

**ANSWER:**     Answering Defendants, on information and belief, deny the allegations in this paragraph.

      68.     Although Saez provided a sworn statement recanting his identification of Plaintiff and Negron prior to Plaintiff's trial, Saez ultimately identified Plaintiff and Negron at trial. Saez later testified that he implicated Plaintiff and Negron at trial in hopes of obtaining favorable treatment from the state regarding his pending violation of probation charge. Assistant Cook County State's Attorney Callahan contacted Saez before Plaintiff's trial and Saez explained that after that conversation it was his understanding that if he testified for the State, he would be released from custody. Saez's probation was in fact terminated on November 30, 1995, two days after his November 28, 1995 trial testimony against Plaintiff.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

69. As a result of GUEVARA's false statements to Grande that Plaintiff and Negron were the shooters in conjunction with the improper and highly suggestive tactic of showing Grande a single photo of Plaintiff prior to having her identify Plaintiff from a line-up, Grande again identified Plaintiff as the shooter consistent with her prior false identification.

**ANSWER:**   Answering Defendants, on information and belief, deny the allegations in this paragraph.

70. Based on the foregoing false and fabricated testimony, a jury convicted Plaintiff of two counts of first degree murder and two counts of attempt first degree murder. The trial court judge found Plaintiff eligible for the death penalty but sentenced him to a term of natural life imprisonment consecutive to two 30-year terms for attempt for first degree murder.

**ANSWER:**   Answering Defendants deny the allegations of misconduct alleged that pertain to them in this paragraph. Answering Defendants, on information and belief, admit that Plaintiff was found guilty of two counts of murder, two counts of attempt murder, and one count of aggravated battery, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

71. Plaintiff's convictions and sentence were affirmed on direct appeal. Private attorney Matthew Kennelly (now United States District Court Judge Matthew Kennelly) represented Plaintiff during post-conviction proceedings, alleging Plaintiff's actual innocence. At an evidentiary hearing, Saez testified that GUEVARA showed him photographs of Plaintiff and Negron prior to viewing a live line-up and falsely told him that "these are the guys who did the shooting." Saez explained that he studied the photos and "went along with it," even though he could not identify them as the offenders.

**ANSWER:**   Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

72. Saez testified that GUEVARA instructed him not to mention that he viewed the photos prior to making the live line-up identification.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

73.     GUEVARA also testified at the evidentiary hearing, falsely claiming that he *never*
showed Saez any photographs prior to viewing the line-up. GUEVARA testified that he developed
a "feeling" during the investigation's preliminary stages that Plaintiff, who had been arrested for
mob action a few days before the shooting, was involved.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

74.     Cook County Circuit Judge James Linn denied Plaintiff's post-conviction petition,
instead crediting GUEVARA's false testimony.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

**Plaintiff's Exoneration**

75.     Throughout his wrongful incarceration, Plaintiff tirelessly fought to prove that he
was innocent and wrongfully convicted of the 1994 murders. In 2010, Plaintiff filed a *pro se*
successive post-conviction, alleging that new evidence showed that detective GUEVARA had a
widespread pattern and practice of framing people. The petition was summarily dismissed by the
circuit court, but the appellate court reversed the cause for further post-conviction proceedings in a
published decision, *People v. Almodovar*, 2013 IL (1st) 101476 (1st Dist. 2013).

**ANSWER:**     Answering Defendants deny, on information and belief, that Plaintiff's conviction
was wrongful, but lack knowledge or information sufficient to admit or deny the
remaining allegations in this paragraph.

76.     Plaintiff, through his counsel, filed an amended post-conviction petition, alleging
Plaintiff's actual innocence. An evidentiary hearing was held on the petition during which Plaintiff
presented substantial evidence of GUEVARA's pattern and practice of misconduct. GUEVARA
refused to testify, instead asserting his Fifth Amendment right to remain silent in response to each

24

and every question directed at him. Saez again testified that he had never seen the shooters and only

identified Plaintiff and Negron because GUEVARA showed him a photo of the Plaintiff and told

him he was the offender and to identify him from the live line-up.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

77.     Prior to a ruling from the circuit court judge, the office of the Cook County State's

Attorney consented to granting Plaintiff and Negron's post-conviction petitions on the grounds that

newly discovered evidence was of such a conclusive character that it would probably change the

result on retrial. The Cook County State's Attorney then moved to vacate Plaintiff and Negron's

convictions and *nolle prosequi* all charges.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

78.     After spending 23 years in a maximum security facility of the Illinois Department of

Corrections, Plaintiff was released from custody on April 14, 2017.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

79.     With no objection from the State, the Honorable Leroy Martin, Jr. granted Plaintiff

(and William Negron) a Certificate of Innocence on November 20, 2017.

**ANSWER:**     Answering Defendants, on information and belief, admit the allegations in this
paragraph.

### Defendants GUEVARA, HALVORSEN and MINGEY's
### History of Framing Innocent Persons

80.     Tragically, Plaintiff's wrongful conviction at the hands of defendant GUEVARA

and his accomplices, including defendants HALVORSEN and MINGEY, is not an isolated

miscarriage of justice. Over the course of two decades, the trio framed literally dozens of other

innocent men who have all lodged independent accusations of similar misconduct against him.[1]

**ANSWER:**      Defendant Olszewski lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.  Defendant Mingey and Halvorsen deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

81.      GUEVARA, HALVORSEN, and MINGEY are the subject of an ever-growing number of litigations both in criminal and civil courts. All three defendants are now refusing to testify about any of their activities as Chicago police officers on grounds that truthful testimony would subject them to criminal liability.

**ANSWER:**      Defendant Olszewski lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.  Defendant Mingey and Halvorsen admit that they have been named as defendants in several matters and deny the remaining allegations in this paragraph.

82.      Defendant GUEVARA has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of identified cases in which GUEVARA has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case.

**ANSWER:**      Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

83.      In many of these cases, detective HALVORSEN worked hand-in-hand with GUEVARA while MINGEY supervised the rogue detectives, approved their investigations, and sometimes played an even more active role in framing suspects. For example, in the case of Jose Maysonet, defendant MINGEY fabricated from whole cloth two oral statements that he attributed to Maysonet – evidence that was later used to wrongfully convict him.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

84.     Given this extensive history, it is apparent that GUEVARA, HALVORSEN, and MINGEY engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

85.     Regarding his role in framing Plaintiff, Defendant GUEVARA has asserted his Fifth Amendment right to silence when questioned about: whether he framed Plaintiff; whether he induced Grande and Saez to falsely identify Plaintiff by showing them photographs of Plaintiff and Negron and telling them to identify them from a live line-up. GUEVARA asserted his Fifth Amendment right in response to questions regarding his frame-ups of dozens of others.

**ANSWER:**     Answering Defendants admit, on information and belief, that Guevara has asserted his Fifth Amendment rights in response to questions about his employment with the Chicago Police Department.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

86.     Repeatedly, defendant GUEVARA has invoked his Fifth Amendment rights and refused to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below. And recently, defendants HALVORSEN and MINGEY have begun asserting their Fifth Amendment rights to refuse to answer questions about their involvement in Area Five investigations, most recently in response to interrogatories propounded to them in the federal civil rights litigation brought by Armando Serrano and Jose Montanez.

**ANSWER:**    Answering Defendants admit, on information and belief, that Guevara has asserted his Fifth Amendment rights in response to questions about his employment with the Chicago Police Department. Answering Defendants deny that Defendants Halvorsen or Mingey are currently asserting their Fifth Amendment rights. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

87.    Bill Dorsch is a former Chicago police detective. While serving with the Chicago police department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant GUEVARA brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place of the shooter.

**ANSWER:**    Answering Defendants admit that Bill Dorsch is a former Chicago Police Detective. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

88.    Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant GUEVARA pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with GUEVARA, saying that was the person who committed the shooting.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

89.    Dorsch then directed Defendant GUEVARA to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

90.    Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant GUEVARA being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

91.     Defendant GUEVARA's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant GUEVARA. The report details that Defendant GUEVARA, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way out of trouble." According to the report, GUEVARA also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that GUEVARA, using an attorney [Richard Beuke] as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

92.     In 1989, Defendant GUEVARA coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant GUEVARA put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

93.     In 1989, Defendant GUEVARA also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

94.     Juan Johnson was later exonerated and brought suit against Defendant GUEVARA. A federal jury found that GUEVARA framed Johnson for murder and awarded Johnson $21 million in damages.

**ANSWER:**   Answering Defendants, upon information and belief, admit that Juan Johnson sued Defendant Guevara and that a jury returned a verdict in Juan Johnson's favor, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

95.   In 1989, Defendant GUEVARA coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

**ANSWER:**   Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

96.   In 1989, Defendant GUEVARA coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

**ANSWER:**   Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

97.   In 1990, Defendant GUEVARA physically coerced Jose Maysonet into falsely confessing to the murders of Torrence and Kevin Wiley. Defendant MINGEY also falsely reported that Maysonet had admitted his involvement in the double murder. Maysonet's convictions were reversed in 2016 and all charges against him were dismissed in November 2017.

**ANSWER:**   Answering Defendants admit, on information and belief, that the charges against Jose Maysonet were dismissed.  Defendants Halvorsen and Olszewski lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.  Defendant Mingey denies the allegations in this paragraph as they pertain to him, and lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

98.   In 1991, Defendant GUEVARA coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. GUEVARA fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the

crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though

Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based

on the lack of sufficient evidence.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

99.    In 1991, Defendant GUEVARA physically coerced sixteen-year-old David

Velazquez into making a false identification and giving false testimony by taking him to a rival

gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for

anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by

GUEVARA.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

100.    In 1993, Defendant GUEVARA coerced an identification from Carl Richmond by

threatening Richmond that he could make his life very uncomfortable if Richmond did not identify

Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with

GUEVARA's tactics, believed that GUEVARA would honor this threat.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

101.    In 1995, Defendant GUEVARA arrested Edwin Davila and, in an attempt to coerce a

confession, chained him to the wall of an interrogation room and told him that he was going to

frame him for murder. After Davila told GUEVARA that he did not do it, GUEVARA forced

Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite

the fact that each of those witnesses had previously told the police that they had not been able to see

the shooter.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

102.    In 1991, Defendant GUEVARA told Efrain and Julio Sanchez to pick David Colon
out of a lineup. As a result, these men falsely claimed that Colon had committed murder, but later
came forward to bring Defendant GUEVARA's misconduct to light.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

103.    In 1995, Defendant GUEVARA coerced Evelyn Diaz into making a false
identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not
identify Luis Serrano as the shooter, her children would be taken away by the Department of
Children and Family Services.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

104.    In 1995, Defendant GUEVARA told Luis Figueroa to falsely identify Angel Diaz as
the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his
identification at trial.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

105.    In 1995, Defendant GUEVARA coerced Gloria Ortiz Bordoy into making a false
statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight-
hour interrogation, GUEVARA yelled in her face, threatened that her children would be taken by
the Department of Children and Family Services, called her "the B word," and "raised his hand"
saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a
statement that the detectives wrote out for her because she just wanted to "get out of there."

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

106.    In 1995, Defendant GUEVARA coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by GUEVARA and identified Ricardo Rodriguez as the offender because GUEVARA told him that Rodriguez was the shooter.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

107.    In 1995, Defendant GUEVARA engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial. Thomas Sierra was exonerated last year but only after serving his enter sentence.

**ANSWER:**    Defendants Mingey and Olszewski lack knowledge or information sufficient to admit or deny the allegations in this paragraph.  Defendant Halvorsen admits Melendez identified Sierra, but denies the allegations regarding Melendez being told who to identify.  Defendant Halvorsen lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

108.    In 1996, Defendant GUEVARA coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at GUEVARA's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

109.    In 1997, Defendant GUEVARA coerced Robert Ruiz into making a false identification. GUEVARA detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling GUEVARA that he had not seen the shooter or the driver involved in the crime, GUEVARA told

Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that GUEVARA would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that GUEVARA was the lead detective in the case because the victim was GUEVARA's nephew.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

110.     In 1997, Defendant GUEVARA withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Antonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told GUEVARA that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. GUEVARA continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key *Brady* material at his trial. Gomez was also exonerated last year.

**ANSWER:**     Answering Defendants deny, on information and belief, that Ariel Gomez was exonerated.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

111.     In 1998, Defendant GUEVARA used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of murder. In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges against Rivera. Rivera was awarded a Certificate of Innocence and his federal civil rights action is currently pending in this Court.

**ANSWER:**     Answering Defendants admit, on information and belief, that charges were dropped against Rivera and he was given a certificate of innocence and that he currently has a civil law suit pending.  Defendants Halvorsen and Olszewski lack knowledge or

information sufficient to admit or deny the remaining allegations in this paragraph. Defendant Mingey, upon information and belief, denies the remaining allegation in this paragraph.

112.     In November 2001, Defendant GUEVARA's girlfriend, Judith Martinez, attended a trial in which GUEVARA was testifying and observed the testimony of trial witnesses. She then conferred with GUEVARA, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

113.     In 1982, Defendant GUEVARA and another officer arrested and physically assaulted Annie Turner for smoking on a bus. GUEVARA called her a "bitch" and pushed her out the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

114.     In 1982, Defendant GUEVARA and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

115.     In 1983, Defendant GUEVARA and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten

about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained

for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt

sought medical treatment for his injuries and filed a complaint with the Office of Professional

Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the

police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable

verdict in a related civil rights action on Hunt's claim of excessive detention against the City of

Chicago.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

116.    In 1984, Defendant GUEVARA and other officers physically assaulted Graciela

Flores and her 13-year old sister Anna during a search of their home, during which the officers did

not identify themselves as police. GUEVARA repeatedly slapped Graciela, called her a "bitch" and

pulled her hair. As a result of this incident, Graciela's arm was dislocated/broken and she spent one

week in the hospital.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

117.    In 1985, Defendant GUEVARA attempted to coerce a false statement from

Reynaldo Munoz. GUEVARA handcuffed Munoz and put him in the back of a squad car. When

Munoz denied knowing the people GUEVARA was asking about, GUEVARA repeatedly hit him in

the mouth with his fist. GUEVARA then took Munoz to rival gang territory where he allowed rival

gang members to spit on Munoz and beat Munoz about the head. Munoz was later framed by

defendant HALVORSEN for the murder of after HALVORSEN induced a false identification from

an alleged witness to the shooting.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

36

118.    In 1986, Defendant GUEVARA threw Rafael Garcia against a car, struck him in the
face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago
Police Department's Office of Professional Standards (OPS). Although GUEVARA denied the
charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the
hospital for lacerations to the head. After an investigation into the incident, OPS found that
GUEVARA had lied about the incident and recommended that GUEVARA be suspended for two
days.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

119.    In 1986, Defendant GUEVARA and two other officers coerced a confession from
Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs
with flashlights during an interrogation. Pena was taken to see a doctor where he complained about
being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations
to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police
custody.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

120.    In 1986, Defendant GUEVARA pulled over Melvin Warren because Warren cut him
off while driving westbound on Augusta Boulevard. GUEVARA called Warren a "nigger dog" and
"threatened to tear [Warren's] head off." GUEVARA hit Warren in the face with a closed fist and
then forced him down into the front seat of his car and began to choke him. Two eyewitnesses
confirmed that GUEVARA initiated the beating. In response to this incident, Warren sought
medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS

37

sustained Warren's allegations that GUEVARA had physically and verbally assaulted him and recommended that GUEVARA be reprimanded.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

121.     In 1989, Defendant GUEVARA coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

122.     In 1991, Defendant GUEVARA coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. GUEVARA told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. GUEVARA then promised Rivera that if he signed a statement, he could go home.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

123.     In 1991, Defendant GUEVARA coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, GUEVARA threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by GUEVARA's partner, Defendant HALVORSEN in the chest and torso. GUEVARA provided details of the crime to Rodriguez to include in Rodriguez's false confession.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

124.     In 1992, Defendant GUEVARA engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

125.     In 1993, Defendant GUEVARA arrested fifteen year old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. GUEVARA also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

126.     In 1993, Defendant GUEVARA used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant GUEVARA, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. GUEVARA threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and GUEVARA translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

127.    In 1994, Defendant GUEVARA, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by GUEVARA.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

128.    In 1995, Defendants GUEVARA and HALVORSEN coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, GUEVARA yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

**ANSWER:**    Defendants Mingey and Olszewski lack knowledge or information sufficient to admit or deny the allegations in this paragraph.  Defendant Halvorsen denies the allegations of misconduct in this paragraph as they pertain to him, and lacks knowledge or information sufficient to admit or deny the remaining allegations.

129.    In 1997, Defendant GUEVARA coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by GUEVARA without *Miranda* warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

130.    In 1998, Defendant GUEVARA repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Rosauro never confessed and was finally released after being held in custody for three days.

**ANSWER:** Defendant Olszewski lacks knowledge or information sufficient to admit or deny the allegations in this paragraph. Defendants Mingey and Halvorsen admit that Rosauro Mejia did not make a confession to the double murder and kidnapping and was later released from custody, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

131.    In 1998, Defendant GUEVARA repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

132.    In1998, Defendant GUEVARA repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

**ANSWER:** Defendant Olszewski lacks knowledge or information sufficient to admit or deny the allegations in this paragraph. Defendants Mingey and Halvorsen admit that Reyes did provide statements regarding the underlying incident. Defendants Mingey and Halvorsen deny the remaining allegations as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

133.    In 1998, Defendant GUEVARA repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

**ANSWER:** Defendant Olszewski lacks knowledge or information sufficient to admit or deny the allegations in this paragraph. Defendants Mingey and Halvorsen admit that Solahce did provide statements regarding the underlying incident. Defendants Mingey and

Halvorsen deny the remaining allegations as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

134.    Reyes and Solache were also exonerated last year and released from prison.

**ANSWER:**    Answering Defendants admit, on information and belief, that Reyes and Solache were released from prison last year.  Defendant Olszewski lacks knowledge or information sufficient to admit or deny the remaining allegations.  Defendants Mingey and Halvorsen deny the remaining allegations in this paragraph.

### Plaintiff's Damages

135.    Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff faced the risk of being executed for a crime he did not commit after having been found eligible for the death penalty. Plaintiff spent 23 years of his life imprisoned for crimes that he did not commit. He woke up each day with this reality, not knowing whether he would see his family or child again outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

**ANSWER:**    Answering Defendants admit, on information and belief, that Plaintiff was incarcerated in prison.  Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

136.    Over the course of his 23 years of imprisonment, Plaintiff was separated from his daughter who was only six months old when he was incarcerated. Plaintiff lost the chance to raise, care for, and mentor his child who was a grown woman by the time Plaintiff was released from prison.

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

137.    As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

**ANSWER:**   Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

### COUNT I 42 U.S.C. § 1983 – Due Process: Fabrication of Evidence

138.   Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**   Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

139.   As more fully described above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Grande and Saez's statements about the shooting and testifying falsely about the witnesses' statement, as well as fabricating other evidence.

**ANSWER:**   Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

140.   According to a plan devised by the defendant officers, Defendant OLSZEWSKI falsely arrested Plaintiff for the sole purposes of obtaining a Poloroid photo of him that would be used to unlawfully influence and manipulate Grande and Saez for the purpose of securing a false identification of Plaintiff.

**ANSWER:**   Answering Defendants deny the allegations in this paragraph.

141.   In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Saez and Grande implicating Plaintiff in the crimes that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial. Defendant HALVORSEN was primarily responsible

43

for authoring the police reports that contained false statements by the witnesses and omitted the

suggestive and improper tactics utilizes to induce false identifications from the witnesses.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

        142.    The defendant officers knowing and intentionally fed false statements to Grande and

Saez prior to Plaintiff's arrest and subsequent charging.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

        143.    The Police Officer Defendants concealed and fabricated additional evidence that is

not yet known to Plaintiff.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

        144.    Absent this misconduct, Plaintiff would not have been wrongfully convicted of the

murders of Merkes and Rodriguez and attempt murders of Grande and Saez. Thus, the Police

Officer Defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and

directly resulted in Plaintiff's wrongful conviction.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

        145.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total

disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

146.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

147.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and the policy and practice of the Chicago Police Department more fully described in Count VI. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

WHEREFORE, Answering Defendants request judgment in their favor and against plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT II 42 U.S.C. § 1983 – *Brady* Violations

148.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**     Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

149.     As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecution.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph.

150.    The Police Officer Defendants also continued to suppress exculpatory evidence after

Plaintiff's conviction, including during an evidentiary hearing on Plaintiff's original post-

conviction petition. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 23

years in prison for a crime he did not commit.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them,
but lack knowledge or information sufficient to admit or deny the remaining
allegations.

151.    The misconduct described above was objectively unreasonable and was undertaken

intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total

disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them,
but lack knowledge or information sufficient to admit or deny the remaining
allegations.

152.    As a direct and proximate result of this deprivation of his constitutional right to a fair

trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish,

humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries

and damages.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them,
but lack knowledge or information sufficient to admit or deny the remaining
allegations.

153.    The misconduct described above in this Count by the Defendant officers was

undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner

more fully described below in Count VI.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against them
and the policy and practice of the Chicago Police Department more fully described
in Count VI.  Answering Defendants lack knowledge or information sufficient to
admit or deny the remaining allegations in this paragraph.

WHEREFORE, Answering Defendants request judgment in their favor and against plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT III 42 U.S.C. § 1983 – Malicious Prosecution

154.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**     Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

155.     In manner more fully described above, the Defendant officers, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

156.     The Defendant officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

157.     In so doing, the Defendant officers caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

158.    The Defendant officers subjected Plaintiff to unauthorized and arbitrary

governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally

framed for a crime of which he was totally innocent, through the Defendant officers' fabrication,

suppression, and withholding of evidence.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

159.    The misconduct described above was objectively unreasonable and was undertaken

intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total

disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

160.    As a direct and proximate result of this deprivation of his constitutional right,

Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation,

degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

161.    The misconduct described above in this Count by the Defendant officers was

undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner

more fully described below in Count VI.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against them and the policy and practice of the Chicago Police Department more fully described in Count VI.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

WHEREFORE, Answering Defendants request judgment in their favor and against plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

### COUNT IV 42 U.S.C. § 1983 – Conspiracy

162.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

163.    All of the individual Police Officer Defendants and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

164.    All of the individual Police Officer Defendants and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

165.    In this manner, the Police Officer Defendants, acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

166.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts

and was an otherwise willful participant joint activity.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

167.     The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

168.     As a direct and proximate result of this of this illicit agreement referenced above,

Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation,

degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

169.     The misconduct described above in this Count by the Defendant officers was

undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner

more fully described below in Count VI.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and the policy and practice of the Chicago Police Department more fully described in Count VI.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

WHEREFORE, Answering Defendants request judgment in their favor and against plaintiff,

costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT V 42 U.S.C. § 1983 – Failure to Intervene

170.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

171.    In the manner described above, one or more of the individual Police Officer Defendants, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

172.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

173.    As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

174.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against them and the policy and practice of the Chicago Police Department more fully described in Count VI. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

WHEREFORE, Answering Defendants request judgment in their favor and against plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT VI 42 U.S.C. § 1983 – *Monell* Policy Claim

Count VI of Plaintiff's Complaint is not directed Answering Defendants, and therefore they answer Count VI only to the extent the allegations herein are adopted and re-alleged in other counts of Plaintiff's Complaint.

175. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

176. The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 75 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

177. The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants GUEVARA, HALVORSEN, OLSHEWSKI and MINGEY employed against Plaintiff in this case, including: (1) concealment of exculpatory evidence; (2) manipulation of witnesses in order to obtain false identifications; (3) manipulation of witnesses in order to influence their testimony; (4) procuring false witness

testimony from detainees and "jailhouse snitches" and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

**ANSWER:** Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

178. The Chicago Police Department systemically targeted Latino men from the Humboldt Park Area for wrongful conviction. It was nothing short of genocide with cooperation from the Cook County States' Attorney's office and complicity from the judiciary that did not question even the most dubious evidence.

**ANSWER:** Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

179. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

**ANSWER:** Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

180.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

181.     At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

182.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, manipulated, tricked, and improperly influenced the testimony of the two living victims in this case, Jacqueline Grande and Kennelly Saez. In the case of Saez, the defendants failed to disclose that Saez had been tacitly promised a "get out of jail free" card in exchange for his testimony against Plaintiff.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

183.    The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph to the extent they are directed against them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

184.    Prior to and during 1994, the year in which Plaintiff was falsely charged with the Merkes and Rodriguez murders, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

185.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph to the extent they are directed against them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

55

186.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

187.     The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are approximately 40 known cases in which GUEVARA and HALVORSEN have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case. GUEVARA engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

188.     The City of Chicago and its Police Department failed in 1994 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

       a.     The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

       b.     The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

       c.     The risks associated with relying on testimony from "jailhouse snitches."

       d.     The risks of wrongful conviction and the steps police officers should take to minimize risks.

       e.     The risks of engaging in tunnel vision during investigation.

       f.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

189.     The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

190.    The City's failure to train supervise and discipline its officers, including repeat

offenders such as Defendants GUEVARA and HALVORSEN, effectively condones, ratifies, and

sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in

this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a

result of the City's practices and *de facto* polices, as alleged above.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against them
and that they acted pursuant to the policies, practices, and customs alleged in this
paragraph.   Answering Defendants lack knowledge or information sufficient to
admit or deny the remaining allegations in this paragraph.

191.    The City of Chicago and officials within the Chicago Police Department failed to act

to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of

the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no

action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against them
and that they acted pursuant to the policies, practices, and customs alleged in this
paragraph.   Answering Defendants lack knowledge or information sufficient to
admit or deny the remaining allegations in this paragraph.

192.    The policies and practices described in the foregoing paragraphs were consciously

approved by the City of Chicago policymakers who were deliberately indifferent to the violations of

constitutional rights described herein.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against them
and that they acted pursuant to the policies, practices, and customs alleged in this
paragraph.   Answering Defendants lack knowledge or information sufficient to
admit or deny the remaining allegations in this paragraph.

193.    The actions of all of the individual Police Officer Defendants were done pursuant to

policies and practices of the Chicago Police Department were done pursuant to one or more

interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which

were ratified by policymakers for the City of Chicago with final policymaking authority. These

policies and practices included, among others:

> a.    conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of witnesses in order to obtain false statements and wrongful convictions.
>
> b.    manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.
>
> c.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, including those by "jailhouse snitches;" and otherwise covering up the true nature of those interviews and/or interrogations.
>
> d.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offenders Defendants GUEVARA and HALVORSEN.
>
> e.    perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

194.     The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

195.     As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

196.     The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

### COUNT VII State Law Claim – Malicious Prosecution

197.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**     Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

198.     All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

**ANSWER:**   Answering Defendants deny the allegations in this paragraph as they pertain to them, and further deny, on information and belief, that the proceedings terminated in a manner indicative of innocence.  Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

199.   The Defendants accused Plaintiff of murdering Merkes and Rodriguez, knowing that he was innocent of the crime. All of the individual defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant officers knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

**ANSWER:**   Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

200.   The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:**   Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

201.   As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**ANSWER:**   Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

WHEREFORE, Answering Defendants request judgment in their favor and against plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

### COUNT VIII State Law Claim – Civil Conspiracy

202.   Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

203.    As described more fully in the preceding paragraphs, the individual Defendant officers acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

204.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

205.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

206.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

WHEREFORE, Answering Defendants request judgment in their favor and against plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

**COUNT IX State Law Claim – Intentional Infliction of Emotional Distress**

207.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:** Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

208. The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

209. The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

210. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

211. As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

WHEREFORE, Answering Defendants request judgment in their favor and against plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT X State Law Claim – Respondeat Superior

Count X of Plaintiff's Complaint is not directed Answering Defendants, and therefore they answer Count X only to the extent the allegations herein are adopted and re-alleged in other counts of Plaintiff's Complaint.

212.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

213.    When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

**ANSWER:**    Answering Defendants admit that they were employees of the Chicago Police Department acting at all relevant times within the scope of their employment and under color of law.  Answering Defendants deny the allegations of misconduct in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

214.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:**    Answering Defendants deny they committed any torts and deny this is an accurate or complete statement of the law.

## COUNT XI State Law Claim – Indemnification

Count XI of Plaintiff's Complaint is not directed Answering Defendants, and therefore they answer Count XI only to the extent the allegations herein are adopted and re-alleged in other counts of Plaintiff's Complaint.

215.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    Answering Defendants hereby reincorporates and reasserts his answers to the foregoing paragraphs of this complaint as though fully set forth herein.

64

216.     Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

**ANSWER:**     Answering Defendants, on information and belief, admit the allegations in this paragraph.

217.     The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

**ANSWER:**     Answering Defendants admit the individual defendants were employees of the Chicago Police Department and, on information and belief, acted within the scope of their employment at all relevant times to Plaintiff's complaint. Answering Defendants deny the allegations of misconduct in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Answering Defendants were government officials, namely police officers, who perform discretionary functions. At all times material to the events alleged in Plaintiff's Complaint, a reasonable police officer objectively viewing the facts and circumstances that confronted Answering Defendants, could have believed their actions to be lawful, in light of clearly established law and the information that Answering Defendants possessed. Answering Defendants are therefore entitled to qualified immunity on Plaintiff's federal claims.

### Second Affirmative Defense

The Answering defendants are absolutely immune from civil liability for their testimony given in judicial proceedings in Plaintiff's underlying criminal case, *Rehberg v. Paulk*, 566 U.S.

356 (2012); *Briscoe v. LaHue*, 460 U.S. 325 (1983); *Jurgensen v. Haslinger*, 295 Ill.App.3d 139 (1998), and for claims that they suborned or conspired to commit perjury. *See House v. Belford*, 956 F.2d 711, 720-21 (7th Cir. 1992).

### Third Affirmative Defense

Plaintiff's claim under Illinois law for intentional infliction of emotional distress (Count VII) is barred by the one-year statute of limitations under the Illinois Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101 because it was not filed within one year after it accrued.

### Fourth Affirmative Defense

Under the Illinois Tort Immunity Act, Answering Defendants are not liable for any of the state law claims alleged because a public employee is not liable for his or her acts or omissions in the execution or enforcement of any law, unless such acts or omissions constitute willful and wanton conduct, and none of their acts or omissions in the execution or enforcement of any law constituted willful and wanton conduct.  745 ILCS 10/2-202.

### Fifth Affirmative Defense

As to Plaintiff's state law claims, Answering Defendants are not liable for any claims alleged because their decisions regarding the investigation and/or the arrest of Plaintiff were decisions that involved the determination of policy and the exercise of discretion for which they are immune from liability.  745 ILCS 10/2-201.

### Sixth Affirmative Defense

As to Plaintiff's state law claims, Answering Defendants are not liable for any claims alleged because a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208.

### Seventh Affirmative Defense

As to Plaintiff's state law claims, Answering Defendants are not liable for any claims alleged claims because a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person.  745 ILCS 10/2-204.

### Eighth Affirmative Defense

Plaintiff's claims as alleged in his Complaint are barred in whole or in part by the applicable statute of limitations.

### Ninth Affirmative Defense

As to the state law claim of Intentional Infliction of Emotional Distress, punitive damages cannot be awarded for this claim under Illinois law. *Knierim v. Izzo*, 22 Ill. 2d 73 (1961).

### Tenth Affirmative Defense

Plaintiff has a duty to mitigate his damages, and any damages awarded to Plaintiff would be required to be reduced by any amount by which the damages could have been lessened by Plaintiff's failure to take reasonable action to minimize those damages.

WHEREFORE, Defendants Mingey, Halvorsen, and Olszewski respectfully request that this Court enter judgment in their favor and against Plaintiff, that the action be dismissed with prejudice, and that costs be assessed against Plaintiff.

## JURY DEMAND

Defendants Ernest Halvorsen, Edward Mingey, and Mark Olszewski hereby demand a trial by jury.

Dated: September 11, 2018          /s/ Josh M. Engquist_____
                                             JOSH M. ENGQUIST, Attorney No. 06242849
                                             *One of the Attorneys for Officer Defendants*

James G. Sotos
Jeffrey N. Given
Joseph M. Polick
Josh M. Engquist
Caroline P. Golden
David A. Brueggen
Jeffrey R. Kivetz
**THE SOTOS LAW FIRM, P.C.**
550 East Devon, Suite 150
Itasca, Illinois 60143
Tel: (630) 735-3300
jengquist@jsotoslaw.com

# CERTIFICATE OF SERVICE

I certify under penalty of perjury, pursuant to 28 U.S.C.A. § 1746, that on September 11, 2018, I electronically filed the foregoing **Defendants Halvorsen, Mingey and Olszewski's Answer and Affirmative Defenses To Plaintiff's Complaint** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants listed in the below service list:

**_Attorneys for Almodovar_**
Jennifer Bonjean
Ashley Blair Cohen
Bonjean LawGroup, PLLC
1000 Dean Street
Suite 422
Brooklyn, NY 11238
718-875-1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com

**_Attorneys for Negron_**
Jon Loevy
Arthur Loevy
Russell Ainsworth
Ruth Brown
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
312-243-5900
jon@loevy.com
arthur@loevy.com
russell@loevy.com
ruth@loevy.com

**_Attorneys for City of Chicago_**
Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Patrick R. Moran
Theresa B. Carney
Rock Fusco & Connelly, LLC
321 N. Clark, Suite 2200
Chicago, Illinois 60654
312-494-1000
erosen@rfclaw.com
pmoran@rfclaw.com
sbenjamin@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com

/s/ Josh M. Engquist
JOSH M. ENGQUIST